[File No. 7166]

HERMON HANSON OIL SYNDICATE, a North Dakota Corporation, Respondent, v. A. A. BENTZ, Walter H. LeRoy and Cleome Y. LeRoy, Appellants.

(40 NW2d 304)

Opinion filed October 31, 1949

*Zuger & Zuger,* for appellants.
*Hyland & Foster,* for respondent.

MORRIS, J. This is an action to quiet title to the Northwest Quarter (NW¼) of Section Five (5), Township One Forty-five (145), Range Eighty-three (83), McLean County, North Dakota. The complaint is in statutory form pursuant to the provisions of Sections 32–1701 and 32–1704, RCND 1943.

The defendant Bentz answered and later Walter H. LeRoy and Cleome Y. LeRoy, his wife, were by stipulation made parties defendant and agreed to be bound by the trial to the same extent as if they had been original parties defendant.

The answer sets forth that on November 10, 1926 the then owners of the property in question who were grantors of Walter H. LeRoy entered into a lease with the plaintiff which is pleaded in full in the answer. The lease covers 480 acres of which the 160 acres involved in this action is a part. It recites that for a consideration of one dollar and other valuable

considerations the lessors gave to the lessee its successors and assigns the right to enter upon the property for the purpose of prospecting and drilling for oil and gas, mining for coal, iron and other minerals, and the right to erect, maintain, lay or remove all necessary buildings, structures, machinery, piping and so forth necessary to carry out the purposes of the lease.

The lease then provides that "This lease, by mutual consent and understanding between the Lessor and Lessee, is taken as a part of a Community Lease in which all and each of the Lessors, or owners, shall be entitled to and share in the royalty to be paid on the product from each and every oil well brought in on any part of this Community Lease, a well drilled on any part of this Community Lease will be sufficient to hold each and all of the individual leases comprising such Community Lease for the time and terms specified in said leases, the Lessors, or owners, sharing pro-rata in the royalty from each well in proportion to the amount of land each has leased to the Lessee.

"If any actual mining for any mineral is undertaken, which is not contemplated, then and in that case the individual owner of the land so mined will be paid the usual mining royalties per ton customary for the particular kind of mineral so mined, such operations not being included in the oil Community leasing proposition.

"In payment to the said Lessor for the rights hereby granted to the said Lessee, the Lessee hereby agrees to pay the Lessor a pro-rata share of One-Eighth (1-8) Royalty on all the oil recovered from said land as above provided and to begin actual drilling operations within five (5) years from this date, on some part of the Community leased land.

"It is understood and mutually agreed that the Lessor is to have what gas he may need to light and heat the buildings on this property free of cost, and the Lessee is also to use what gas or oil he may require for lighting and drilling operations at all times without cost.

"It is further stipulated that unless drilling shall begin on some part of this Community Lease within the specified five year period then and in that case each one of the leases comprising this Community Lease shall become null and void and the Lessee

hereby pledges the execution of a proper release to each owner of his particular property.

"However, it is mutually understood and agreed between the Lessor and Lessee that in case the Lessee is prevented by unusual and unexpected obstacles from beginning drilling within the specified period, an extension of three years time will be granted by the Lessor on payment in advance of one dollar per acre per year.

"The Lessee further agrees to start the drilling of a second well at some point on said Community Lease within ninety days after the first well is finished, and begin the drilling of an additional well every sixty days after each succeeding well is finished. It is distinctly understood and agreed that this lease is to be in full force and effect as long as oil in paying quantity is produced, upon any part of the land included in the Community Lease.

"All the conditions to this contract shall be binding on the heirs, executors, successors or assigns of both the parties hereto."

It is alleged that the plaintiff obtained leases containing the same provisions, covering some 96,000 acres of land and did enter upon some part of the lands under community lease and begin drilling thereon for oil within five years from the date of the lease in question, but that the well was never completed. It is then alleged that the plaintiff abandoned its well and lease and that it also forfeited all rights that it acquired thereby.

The answer next sets forth that on July 19, 1949 the defendants, Walter H. LeRoy and Cleome Y. LeRoy, the then owners of the property in question, executed a lease to the defendant A. A. Bentz for the purpose of mining and operating for oil and gas on a royalty basis of one-eighth part of the gross proceeds. This lease is to run for a term of ten years and as long thereafter as oil or gas or either of them is produced from the land. It also provides that if no well is commenced on the land before two years the lease shall terminate unless the lessee pay a delay rental of $16.00 per year. This lease is also made assignable and binding upon the heirs, executors, administrators and successors of the parties, and contains a warranty of title by the lessors. The defendants then ask that the court

decree the lease to be valid and the lease of the plaintiff to be void.

The defendants first contention is that the plaintiff abandoned its lease prior to the execution of the lease to A. A. Bentz.

The abandonment of property or an interest therein implies a voluntary relinquishment thereof. Intent is an essential element of abandonment. We have followed this general rule with respect to the rights of a vendee under a land purchase contract. Barnes v. Hulet, 34 ND 576, 159 NW 25, and with respect to homestead rights, Larson v. Cole, 76 ND 32, 33 NW(2d) 325; Grotberg v. First Nat'l. Bank, 54 ND 548, 210 NW 21. The same general rule is applicable where a lessor seeks to terminate an oil and gas lease on the ground that the lessee has abandoned it. Unless it appears either by direct evidence or preponderant circumstances that the lessee intended to abandon his lease, the courts will not declare it terminated on that ground. Intention of the lessee to abandon an oil lease is a requisite. Rea v. Glenn, 133 Cal App 82, 24 Pac (2d) 204; Thornton v. Phelan, 65 Cal App 480, 224 Pac 259; Luman v. Davis, 108 Kan 801, 196 Pac 1078; Ball v. Ball, 137 Misc 693, 244 NYS 300; Cleveland Stone Co. v. Hollingworth, 63 SD 586, 262 NW 171; Boatman v. Andre, 44 Wyo 352, 12 Pac (2d) 370. In Oklahoma a long line of cases emphasizes the necessity of intent to relinquish as a basis for abandonment and in recent decisions a showing of intention to abandon accompanied by physical relinquishment is required. Doss Oil Royalty Co. v. Texas Co., 192 Okl 359, 137 Pac (2d) 934; Skelly Oil Co. v. Boles, 193 Okl 308, 142 Pac (2d) 969; Anderson v. Talley, 199 Okl 491, 187 Pac (2d) 206.

The record in this case shows that the plaintiff began drilling a well on a tract of land covered by the community lease other than that described in the lease involved in this action in 1928 which was well within the period of five years prescribed by this lease. Actual drilling operations on this well were suspended in the fall of 1933. During this period the territory covered by the community lease was wholly unexplored; in fact, the nearest attempt at drilling a well was something over one hundred miles away. The plaintiff was induced to undertake

the leasing and exploration of the territory for oil and gas by favorable geological reports. Identical leases involving the community feature were obtained covering 96,000 acres.

The plaintiff erected on the building site an office, two bunk houses, a cook house and a derrick, installed drilling machinery and purchased casing, at an expense of over $29,000. The main well was drilled to a depth of 1840 feet. When drilling was suspended the derrick was not removed, neither was the casing withdrawn from the well. The power plant consisting of a diesel unit was moved to a near-by farm and stored. The drilling equipment can be put into operation again within twenty-four hours. The suspension of drilling in 1932 was due to depletion of funds and the plaintiff later undertook other operations with a view to procuring money with which to complete the well. These operations included the conduct of strip coal mining operations on land covered by the community lease in 1937 and 1938, experiments with extracting gold from gravel, and the leasing of a tract of land in Michigan on which a well was drilled which failed to produce oil. From time to time the officers of the plaintiff corporation made efforts to procure financing sufficient to enable it to complete the well and continue exploration operations. They attempted to make contracts with drillers to continue the work. None of these efforts was successful. As late as 1945 a tentative contract was made with a driller which did not produce results. In 1940 an application was made to the Securities Exchange Commission for permission to sell $300,000 worth of stock and a hearing thereon had in Washington which was attended by the Secretary-Treasurer of the plaintiff corporation. During the war the War Production Board sought to have the plaintiff scrap its equipment and pull up the casing which the plaintiff refused to do and advised the Board that plaintiff intended to continue drilling. The plaintiff has from time to time executed waivers of priority in favor of mortgagors to enable lessors to secure mortgages. It has recently executed waivers to the United States in connection with the building of the Garrison Dam. During World War II it was impossible for companies like the plaintiff to procure pipe for casing or equipment to carry on operations of the nature involved here,

but casing is now available. Since the War the plaintiff has leased under the community lease approximately 10,000 acres in addition to the original 96,000. It has also leased approximately 10,000 acres from the State of North Dakota that is not covered by the community lease. Two officers of the plaintiff corporation testified that it is their intention to continue operations and to drill the well to a sufficient depth to either be a producing well or a dry hole, and to that end a tentative agreement has been reached with a drilling concern to proceed with the work, and that it is the intention of the officers of the plaintiff corporation to proceed with the drilling with reasonable diligence. Upon this evidence the trial court found "That plaintiff has, under the terms of said individual leases comprising its community lease continued to fulfill all terms thereof and has with reasonable diligence carried on its drilling operations, and has not in fact or law abandoned the same."

The idea of drilling for oil within the area covered by the community lease originated with Hermon Hanson, who at one time operated a coal mine in the area. He was the moving spirit in organizing the Hermon Hanson Oil Syndicate in which he was joined by his neighbors. His two sons are now President and Secretary-Treasurer respectively of the company. It is clear from this record that the Hanson family still has faith in the production of oil from lands in the area. The evidence does not show either a physical relinquishment or an intention to abandon. It amply supports the conclusion reached by the trial court that there was no abandonment. The contention of the defendants in this respect fails when measured by the rules established by the authorities which we have cited above.

That a well was begun within the time specified in the plaintiff's lease is clearly established. The defendant contends that there must be read into the lease an implied covenant or condition that the well must be completed within a reasonable time, that the well was not so completed and that this breach of implied covenant wrought a forfeiture of the lease.

The contention of the plaintiff in this case is not unlike that of the defendants in Hudspeth v. Schmelzer, 182 Okl 416, 77 Pac (2d) 1123, wherein the court said, "The defendants further

contend that the duty of the lessee to diligently proceed with the drilling of the well, if any such duty exists, rests upon an implied rather than an express covenant, and that the judgment should be reversed because no demand to comply with the implied covenant was made. The lease contained no express stipulation regarding due diligence, so it may be conceded that such covenant is implied herein. Summers on Oil & Gas, Sec. 134. It is a settled rule in the law of oil and gas that in a case of a breach of an implied covenant to properly develop an oil and gas lease the lessor must demand that the implied covenant of the lease be complied with, and a reasonable time thereafter be given, before a court of equity will grant a forfeiture."

These leases, due to the community lease provision, involve a large number of lessors, none of whom made a demand upon the plaintiff to proceed with the completion of the well. The defendants, LeRoys, made no such demand before executing the lease to the defendant Bentz, neither did they give notice nor make demand thereafter.

The only stated provision in the lease for forfeiture is for breach of the covenant to begin drilling. The lease is for an indefinite time rather than for a term of years and contains no termination date. The purpose of the lease as expressed therein is for prospecting and drilling for oil and gas and mining minerals. The emphasis of the lease points to drilling for oil as the purpose uppermost in the minds of the parties thereto. In furtherance of this purpose a covenant will be implied on the part of the lessee to prosecute drilling operations with reasonable diligence. To do otherwise would leave the lessors permanently helpless to secure relief for the failure of the lessee to proceed after he had once commenced drilling. A court of equity can and will grant relief by decreeing the cancellation of a lease for failure to proceed with drilling operations with reasonable diligence where it appears that such cancellation is equitable under the circumstances and not contrary to the terms of the lease. But this does not mean that the lessor may arbitrarily treat the lease as terminated without notice to the lessee and without taking legal proceedings to effect such termination.

In this case the LeRoys who had succeeded to the title of the

original lessors and whose interests were subject to the plaintiff's lease, by the execution of a second lease to the defendant Bentz, ignored the first lease entirely and treated it as void. Such was not their privilege. Equity will not embrace such arbitrary action and thus lend its aid to the production of an inequitable result. They and their predecessors in interest had indicated no dissatisfaction with the suspension of drilling operations by the plaintiff or the subsequent delay in resuming operations. If the LeRoys were dissatisfied with the failure of the plaintiff to resume drilling operations and continue them until the well was completed, they owed the duty to the plaintiff to so advise it and to demand that operations be resumed and prosecuted with reasonable diligence. This they have not done. They elected to treat the plaintiff's lease as void and execute another lease to Bentz. In this action to quiet title the defendants counterclaim and ask the court to decree that their lease is the only valid one. Thus in an oblique attack upon the plaintiff's lease they ask that a forfeiture be decreed. They are not entitled to this relief and until they have made proper demand and given the plaintiff an opportunity to complete the well with reasonable diligence and dispatch equity will afford them no relief whatever. Leeper v. Lemon G. Neely Co., 6 Cir, 1923, 293 F 967; Metzler & Co. of California v. Stephenson, 217 Cal 236, 18 P2d 330; New American Oil & Mining Co. v. Troyer, 166 Ind 402, 76 NE 253, 77 NE 739; Indiana Natural Gas & Oil Co. v. Beales, 166 Ind 684, 76 NE 520; Monarch Oil, Gas & Coal Co. v. Richardson, 124 Ky 602, 99 SW 668; Young v. Dunn, 302 Ky 232, 194 SW2d 378; Temple v. Lindsay, 182 La 22, 161 So 8; Venedocia Oil & Gas Co. v. Robinson, 71 Ohio St 302, 73 NE 222, 104 Am St Rep 773, 2 Ann Cas 444; Hitt v. Henderson, 112 Okl 194, 240 P 745; Smith v. Tull, 171 Okl 475, 43 P2d 84; Reserve Gas Co. v. Wilson, 78 W Va 329, 88 SE 1075; Johnson v. Armstrong, 81 W Va 399, 94 SE 753.

We have reached the conclusion that the record in this case shows that there has been no abandonment. The lease to the plaintiff carries an implied covenant that the well that was started be drilled to completion with reasonable diligence and a breach of that covenant is ground for applying to a court of

equity for a forfeiture of the lease, but before the lessors' or their successors in interest are entitled to such relief they must show they have made demand upon the plaintiff to comply with the implied covenant and have allowed a reasonable time for such compliance.

The trial court in addition to determining that the plaintiff's lease is valid and has not been abandoned, decreed that the second lease to the defendant Bentz is null and void. The latter lease contains a warranty of title, the effect of which is not an issue in this action and we do not determine that the second lease is void. The judgment appealed from should be modified so as to provide only for the validity and priority of the plaintiff's lease as against any claim, lease or title of the defendants. It is directed that the judgment be so modified and affirmed.

NUESSLE, C. J., and CHRISTIANSON, GRIMSON and BURKE, JJ., concur.