**Edwin FELAND, Mildred Feland and James C. Hayes, Plaintiffs and Respondents,**

v.

**PLACID OIL COMPANY et al., Defendants, and**

**Placid Oil Company; Cardinal Petroleum Company; Kye Trout, Jr.; Eklund Bros. Transport, Inc.; Richard Dach and Lilas Dach; and Dakota International Petroleum, Inc., Defendants and Appellants.**

**Civ. No. 8548.**

Supreme Court of North Dakota.

Oct. 30, 1969.

Pearce, Engebretson, Anderson & Schmidt, Bismarck, for appellants Cardinal Petroleum Co., Kye Trout, Jr., Eklund Bros. Transport, Inc., Richard Dach and Lilas Dach, and Dakota International Petroleum, Inc.

Fleck, Smith, Mather, Strutz & Mayer, Bismarck, for appellant Placid Oil Co.

Joseph P. Stevens, Minot, and Raymond J. Gengler, Denver, Colo., for plaintiffs and respondents.

TEIGEN, Chief Justice.

The question to be resolved in this case is: What is the effect of a shut-in for a period of nine months of a producing oil well under a clause in the lease, commonly referred to as a "thereafter" clause, which provides that after the primary term has expired the lease shall continue in effect "as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced from said leased premises, * * *"?

The oil well in question was shut in for the reason that the salt water disposal pit was filled and the operator claims it was not reasonable, under the circumstances of this case, to make other arrangements for salt water disposal during the shut-in period.

The well produced about seventy-six per cent salt water and twenty-four per cent oil. The salt water was separated from the oil at the well site and allowed to run into the salt water disposal pit. The well was completed on September 10, 1961, and was operated with only temporary shut-ins until August 1964 when it was shut in for a period of nine months because the salt water disposal pit had filled. Production was resumed in June of 1965 when the level of the water in the salt water disposal pit had lowered by the process of evaporation to a point where production could be resumed. The well was in production at the time of trial.

The lessors by this action seek a declaration of termination of the lease and a judgment quieting the title to the land. The trial court found for the lessors and the operator has appealed.

The record establishes the lessors had refused permission to dig another pit upon their land for the disposal of salt water and the evidence establishes it was not economically feasible for the operator to connect to a salt water disposal system located about one and one-half miles distant from the well.

The position taken by the lessors is that the shut-in for a period of nine months was not reasonable. They admit the existing salt water pit was filled and that additional salt water disposal facilities were necessary if production was to be continued. They did not argue the operator was required to convert to the salt water dis-

posal systems located some distance away. The thrust of their argument is that the operator, in spite of the refusal of the lessors to give consent, should have prepared another salt water disposal pit upon the lessors' land. They cite Bell v. Cardinal Drilling Co. (N.D.1957), 85 N.W.2d 246, in support of their argument. *Bell* is of no help here. In *Bell* the lessor was seeking damages for a breach of (an oil and gas lease) contract for the destruction of crops and damage to his land resulting from drilling operations. The lease provided the driller had the right to use so much of the land as was reasonably necessary in drilling a test well and the court found that there was no allegation in the complaint and no proof that the operator had used more land than was reasonably necessary for the purpose intended and reversed a jury verdict for damages.

We are concerned here with a producing well and not exploration. The lease in the instant case grants exclusive right to the lessee to use the described land for the purpose of:

"operating for and producing therefrom oil, gas, casinghead gas, casinghead gasoline, and laying pipelines, telephone and telegraph lines, and building tanks, powers, stations, gasoline plants, ponds, roadways and structures thereon to produce, save and take care of said products, and the exclusive right of injecting water, brine and other fluids into subsurface strata, and housing and boarding employees and any and all other rights and privileges necessary, incident to, or convenient for the economical operation alone, or conjointly with neighboring land, for the production, saving, and taking care of oil, gas, casinghead gas, casinghead gasoline and the injection of water, brine and other fluids into subsurface strata, * * *"

The Industrial Commission of North Dakota, under the authority granted by Section 38-08-04(2) (e), N.D.C.C., promulgated the following rule relative to salt water disposal:

"All salt water liquids or brines produced with oil and natural gas shall be disposed of without pollution of fresh water supplies. Disposal shall be in accordance with an order of the Commission, after hearing, as prescribed in Rule 701.

"Pending the order of the Commission, salt water liquids or brines may be impounded in excavated earthen pits provided that the level of the liquid in the pits shall at no time be permitted to rise above the lowest point of the ground surface level. All pits shall have a continuous embankment surrounding them sufficiently above the level of the surface to prevent surface water from running into the pit. Such embankments shall not be used to impound salt water or brine.

"At no time shall salt water liquids or brines be allowed to flow over the surface of the land or into streams.

"Pits shall not be constructed within natural surface drainage channels and, before any salt water liquid or brine is placed in the pit, any pit which is bottomed in permeable materials, such as sand or gravel, shall be lined with an impermeable material.

"The Commission shall have the authority to condemn any pit which does not properly impound such water."

It appears the salt water disposal pit conformed to the requirements of the rule and apparently was adequate for the purpose intended until August of 1964.

■ We find under the grant that the operator, as lessee, was entitled to construct an additional salt water disposal pit on the land if it was necessary, incident to or convenient for the economical operation for the production of oil from the land. The questions then arise: (1) Was this right and privilege abrogated by the lessors' refusal, upon the operator's oral request, to construct another salt water dis-

posal pit upon the land; (2) If not, does the refusal of the lessors absolve the lessee, as operator, of its responsibility to the lessors to exercise reasonable diligence and good faith in restoring production within a reasonable period of time; (3) If we answer both questions in the negative, was the failure to construct another salt water disposal pit reasonable and in the exercise of good faith; and, finally, (4) Was nine months a reasonable time in which to resume production under the circumstances?

The request for permission to construct an additional salt water disposal pit, we believe, establishes a decision on the part of the operator-lessee that the construction of this pit was necessary, incident to or convenient for the economical continued operation of the well for the production of oil. The alternative apparently was to keep the well shut in until enough salt water evaporated from the existing pit for the resumption of production. No other plan is submitted and it is undisputed that it would not be economically feasible to connect to the disposal well located one and one-half miles away.

This is a case of first impression in this state. A good summary of cases on the question of stoppage of production is contained in 100 A.L.R.2d 885, 888. It states:

"Sec. 2. *Summary*.

"Where the life of an oil and gas lease has been extended beyond its primary term by reason of production of either or both of such minerals, there is full accord in the proposition that a temporary cessation of production will not in and by itself terminate the lease. * * *

"While these rules find virtually universal acceptance, there are substantial variances in their application in determining the rights of the parties. Thus, many courts hold that a cessation of production after expiration of the primary term, through no fault of the operator, will not terminate rights dependent upon continued production so long as the oper-ator exercises reasonable diligence and good faith in attempting to restore production. Closely related to the question of the operator's diligence and good faith is the 'time factor,' which has been stressed in some instances, the courts holding or indicating that where there has been a cessation of production rights are not lost if production is resumed within a reasonable time.

"The reasonable diligence, good faith, and reasonable time cases appear to constitute a 'middle-of-the-road' view. On one side are those cases which hold or indicate that rights subject to a 'thereafter' clause or its equivalent are not lost by a cessation of production after the expiration of the primary term unless there has been an abandonment by those responsible for maintaining production, while on the other side are those cases in which the courts have applied a strict rule to the effect that rights dependent upon continued production after the primary term of a lease has expired will terminate upon cessation of production unless such cessation is temporary and is due to mechanical breakdown of the operating equipment or the like. Other courts have adopted a different rule, holding that a cessation of production after the expiration of the primary term is to be treated as creating a tenancy at will, which requires some further action by the parties to terminate rights existent by virtue of a 'thereafter' clause."

We agree with the general rule that temporary cessation of production will not, in and by itself, terminate the lease.

The first issue to be faced thus becomes whether the operator's right and privilege to construct an additional salt water disposal pit was abrogated by lessors' refusal to grant permission for such construction after the operator's oral request.

"An oil and gas lease carries with it the right to possession of the surface to the extent reasonably necessary to enable the lessee to perform the obligations imposed

upon him by the lease. [Citations omitted.] 'This rule is based upon the principle that when a thing is granted all the means to obtain it and all the fruits and effects of it are also granted.' [Citations omitted.] Accordingly, the right to such use of the surface is implied if it is not granted, whether the form of conveyance is a mineral deed or a lease." [Citations omitted.] 4 Summers, Oil & Gas, Sec. 652, page 2.

Of course, in the instant case, the rights of the operator to use the land are not based on implied rights but rather on the rights expressly granted by the lease. The lease expressly designates the lessee's surface rights, including the broad authorization to "all other rights and privileges necessary, incident to, or convenient" for economical operation and production of oil. In a case dealing with a lease similar to the one in the present case, the Supreme Court of Mississippi reversed a verdict for plaintiff insofar as it included damages for construction by the operator of a second and much larger salt water disposal pit. The original pit in that case was twenty-three feet long, nineteen feet wide, and two and one-half or three feet deep, and the larger pit was ninety yards long, sixty yards wide, and fifteen feet deep. The court stated its reasoning as follows:

"Thus under the law and under this particular oil and gas lease, the defendant has the right to dig the original pit and to use it for the storage of salt water. When it became insufficient, as the proof here disclosed, the defendant had the right to construct another; and it was the judge as to the kind of pit it should construct. Its act in so doing was not unreasonable, oppressive, or capricious. The plaintiff had complained that salt water from the small pit was overflowing onto his land. Besides the field was making more salt water, and it was necessary to increase the capacity of the then existing pit, or to dig a larger one." Gulf Refining Company v. Davis, 224 Miss. 464, 80 So.2d 467, 469 (1955).

Under a usual oil and gas lease, the lessee, in developing the leased premises, is entitled to use of the land reasonably necessary in producing the oil, including space for construction of pits to confine salt water. Powell Briscoe, Inc. v. Peters, 269 P. 2d 787 (Okl.1954). Even though the surface rights of the lessee may arise by implication, it is important to note that lessee's rights are primarily governed by the specific grant of such rights in the lease.

"Whether the express uses are set out or not, the mere granting of the lease creates and vests in the lessee the dominant estate in the surface of the land for the purposes of the lease; by implication it grants the lessee the use of the surface to the extent necessary to a full enjoyment of the grant. Without such use, the mineral estate obtained under the lease would be worthless. However, in the lease before us, express uses of the surface were set forth and the extent of such uses was specified. * * * The case before us is controlled by the express provision as to extent or scope of the use to be made of the surface, rather than any implied right to use." Texaco, Inc. v. Faris, 413 S.W.2d 147, 149 (Tex.Civ.App.1967).

In the instant case the operator's rights were made clear by the broad authorization in the express terms of the lease. These rights were not abrogated by lessors' refusal to grant permission for construction of salt water disposal pits. Operator's rights as lessee were not dependent on lessors' granting or not granting permission. Lessors' refusal was of no legal significance in regard to this first issue.

The second issue to be answered is whether the lessors' refusal absolved the lessee, as operator, of its responsibility to the lessors to exercise reasonable diligence and good faith in restoring production within a reasonable period of time.

Since the operator, as lessee, had a right in this case to dig an additional pit if

its use of the land was reasonable for the purpose of extracting gas and oil contemplated by the lease, and lessors' oral refusal did not terminate this right, the operator was not absolved of its responsibility to exercise reasonable diligence and good faith in restoring production. The wishes and desires of the lessors in this case could not excuse any failure of the operator-lessee to meet its obligations if, in fact, there was any such failure.

■ This brings us to the crux of the case: Was the failure to construct another salt water pit reasonable and in the exercise of good faith? The law is well settled that the lessee in any oil and gas lease has an implied obligation to the lessor to do everything that a reasonably prudent operator should do in operating, developing and protecting the property with due consideration being given to the interests of both the lessor and lessee, if there is no express clause in the lease relieving the lessee of this implied duty. 38 Am.Jur.2d, Gas & Oil, Section 127, page 601. The determination of whether operator's failure to construct another salt water disposal pit was reasonable and in the exercise of good faith must be made in light of this implied obligation and in light of all the surrounding circumstances. The remedies of lessors in cases of violation by lessee in operating under a lease are varied in different states, usually dependent upon the nature of the property interest created by the oil and gas lease. 3 Summers, Oil & Gas, Section 431. Remedies of lessors in North Dakota have been summarized by Summers as follows:

"In North Dakota an oil and gas lease may be cancelled on the theory of abandonment by the lessee or for breach by the lessee of implied covenants for reasonable development. To constitute abandonment there must be proof of the lessee's intention to abandon and actual relinquishment of the property. Cancellation of a lease for the breach of an implied covenant for development will not be granted in the absence of proof of a demand upon the lessee to comply with the implied covenant and an allowance of a reasonable time for compliance." 3 Summers, Oil & Gas, Section 468, page 365.

In the instant case lessors premise their case on breach of covenant and not on abandonment. Thus the operator's argument that the case should be decided in its favor because no abandonment occurred under the requirements set out in Hermon Hanson Oil Syndicate v. Bentz, 77 N.D. 20, 40 N.W.2d 304, is without merit. The issue to be decided is whether the lease automatically terminated because of the alleged breach by cessation of production. It should be pointed out that in Hermon Hanson Oil Syndicate, *supra*, the court held that in case of a breach of an implied covenant under an oil and gas lease the lessor must demand that the implied covenant of lessee be complied with and a reasonable time thereafter given before a court would grant a forfeiture. However, the general requirement of such notice to lessee does not apply if the lease terminates under the "thereafter" or habendum clause. 3 Summers, Oil & Gas, Section 469, page 367; Gillespie v. Wagoner, 28 Ill.2d 217, 190 N.E.2d 765 (1963); Logan v. Blaxton, 71 So.2d 675 (La.App., 1954) (on re-hearing).

In making the determination of whether or not the oil and gas lease automatically terminated because of the nine-month cessation of production, this court must take into consideration the surrounding circumstances. Cases in other jurisdictions give some guidelines in making such determination, but ultimately such decisions must be decided in light of the particular fact situation, keeping in mind the legitimate interests of both lessor and lessee.

Some courts have been generous in finding that prolonged cessations were temporary rather than permanent in character. Thus, in Stimson v. Tarrant, 132 F.2d 363 (9 Cir., 1942), after expiration of the primary term, there was a cessation of pro-

duction for fourteen months due to a lack of a market and lack of storage. The court refused to cancel the lease on the ground that the lessee had exercised reasonable diligence in attempting to find a market and at no time intended to abandon the lease. In Townsend v. Creekmore-Rooney Co., 358 P.2d 1103 (Okl.1960), after a retrial was granted as reported in 332 P.2d 35, the court held that despite the fact that no substantial production was marketed for a period of three and one-half years because of a lack of a market for gas, the lease, dependent upon production, should not be cancelled. The court said that whether a lessee has used due diligence depends upon the facts in each case and that the lessee, during the three and one-half years, had used such diligence and that a market was found within a reasonable time. In another Oklahoma case the court held the lease did not terminate where production ceased for twelve months due to the fact that the engine providing power for the operation of the wells broke down, and lessee made persistent good faith efforts to obtain the parts necessary for repair. Kerr v. Hillenberg, 373 P.2d 66 (Okl.1962).

However, none of these cases deal specifically with cessation of production due to a need for additional salt water disposal pits. In deciding whether another pit should be dug, the operator had to consider many factors to determine whether such action would be reasonable. It had to estimate how long production would be halted because of the salt water problem, whether the pit would be required in the future to make the well productive, how much detriment would result to lessors' land as a result of the digging, and many other factors. There is nothing in the record to indicate a lack of good faith on the part of the operator. Seeking the lessors' opinion in regard to the additional pit indicates that the operator, in this case, was not only making a decision of how it would affect its own position but also took into consideration the lessors' interest. Subsequent events also seem to justify the nine-month

period of cessation. Sufficient water had, by natural processes, evaporated from the salt water disposal pit by June of 1965 at which time the operator placed the well back on production. Oil production has been maintained after June of 1965 to the date of trial, using the original pit for salt water disposal.

The lessors have introduced no evidence to demonstrate that the operator did not exercise reasonable diligence, but rely on the fact that the cessation of production, of itself, was sufficient to automatically terminate the lease. It has been said that since there are various justifiable causes for the slowing up, or temporary cessation, of production, it would be harsh and inequitable to automatically terminate a lease in all cases of cessation. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 695, 79 A.L.R.2d 774. The court in that case went on to state how the interests of both lessor and lessee must be weighed in determining whether a lease has terminated:

"'The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required.'"

■ The evidence in the case indicates that the operator, at no time during cessation, intended the cessation to be permanent. No equipment was removed from the well, electrical power connections were maintained continuously, the contract pumper continued to inspect the well, and, as soon as there was available storage for salt water, production was resumed. The record does not establish the cost of constructing an additional pit but, in light of

the facts in the record, it cannot be said that the operator's failure to construct the pit amounted to a violation of its obligation to use reasonable diligence and act in good faith.

■ The final issue raised by this appeal is whether nine months was a reasonable time to wait before resuming production under the circumstances. Much longer periods have been found to be reasonable. Saulsberry v. Siegel, 221 Ark. 152, 252 S.W.2d 834 (1952); Stimson v. Tarrant, *supra*; Townsend v. Creekmore-Rooney Co., *supra*. Whether a period of time is reasonable is, of course, dependent upon the particular circumstances of each case. The evidence in the record indicates that the shut-in in this case improved the oil/salt water ratio and favorably affected the number of barrels of oil produced. Thus lessors' Exhibit 5 indicates that the last seven full months of operation before the shut-in in 1964 resulted in 2,650 barrels of oil and 6,014 barrels of water being produced, and that the first seven months after the shut-in resulted in the production of 5,079 barrels of oil and 3,657 barrels of water. Production in 1966 and 1967, up to the time of trial, also indicates a more favorable oil/salt water ratio than just prior to the shut-in. The nine-month period of cessation thus has had a favorable effect on the over-all production of the well and, in light of all the evidence in the record, the shut-in period cannot be said to have been unreasonable.

We believe that the record amply demonstrates that the lease estate did not terminate. We find that the findings of the trial court and the conclusions of law based thereon are not sustained by the evidence or the law and, therefore, the judgment of the district court is reversed except insofar as the court held that the plaintiff, James C. Hayes, has no interest in said land or said leases, an issue not contested in this appeal.

STRUTZ, ERICKSTAD, PAULSON, and KNUDSON, JJ., concur.