Theodore OLSON, Plaintiff
and Appellee,

v.

Earl SCHWARTZ and Gofor Oil,
Inc., Defendants,

Vern Lund, Defendant and Appellant.

Merwyn L. LARSEN, Dwaine Larsen,
Marlene Resch, and Marlys Rodenz,
Plaintiffs and Appellees,

v.

Earl SCHWARTZ, Defendant,

and

Prosper Energy Corporation,
Defendant and Appellant.

Civ. Nos. 10466, 10503.

Supreme Court of North Dakota.

Feb. 6, 1984.

Richard H. McGee, Sr. [argued], of McGee, Hankla, Backes & Wheeler, Minot, for appellant in Civ. No. 10466.

Frederick E. Whisenand, Jr. [argued] and Bruce O. Bekkedahl, of McIntee & Whisenand, Williston, for appellee in Civ. No. 10466.

Gary R. Wolberg [argued], of Fleck, Mather, Strutz & Mayer, Ltd., Bismarck, for appellant in Civ. No. 10503.

Bruce O. Bekkedahl [argued], and Frederick E. Whisenand, Jr., of McIntee & Whisenand, Williston, for appellees in Civ. No. 10503.

GIERKE, Acting Chief Justice.

These are appeals from separate judgments of the District Court of Burke County decreeing cancellation of portions of certain oil and gas leaseholds on the theory of abandonment. We reverse.

These cases had been consolidated for trial in the district court on December 16, 1982, with three other cases involving similar factual issues. On April 20, 1983, the district court issued its memorandum opinion in lieu of findings of fact, conclusions of law, and order for judgment. Separate judgments were entered in each of the five cases and appeals were taken in three of these cases. These appeals were consolidated for oral argument before this court. Because a resolution of the issues involved in the third case, *Sorum v. Schwartz*, 344 N.W.2d 73 (N.D.1984), turns on considerations of law distinct from those at issue in the instant cases, we will address that case in a separate opinion.

I

THE OLSON LEASE

On June 7, 1949, Earl Monson and Twila Monson executed and delivered an oil and gas lease to Stanolind Oil and Gas Company. The lease conveyed certain oil and gas interests in and under the East Half (E ½) of Section Eighteen (18), Township One Hundred Sixty-two (162), Range Ninety (90) West, in Burke County. The sole consideration for this lease was either delay rentals or a one-eighth royalty from production. The term of the lease was for ten years "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee".

In 1958, within the primary term of the lease, a well was drilled resulting in production on the Northwest Quarter of the Northeast Quarter (NW ¼ NE ¼) of Section 18. This well has been producing oil in paying quantities since that time with only occasional interruptions during the winter months.

In 1962 the defendant, Earl Schwartz, acquired an interest in the East Half of the

Northeast Quarter (E ½ NE ¼) and the West Half of the Southeast Quarter (W ½ SE ¼) of Section 18. The remainder of the leasehold, including the existing well, was acquired by the defendant, Vern Lund, in 1969. Lund has been the sole operator of the well since that time.

The plaintiff, Theodore Olson, is one of several holders of the mineral interest in the leasehold. The leasehold contains 320 acres and is subject to 160-acre spacing. All parties concede that there has been no exploration or development of the leasehold since the original well was drilled in 1958, in spite of the fact that spacing is available for an additional well on the Southeast Quarter (SE ¼) of Section 18.

## II

## THE LARSEN LEASE

On June 4, 1949, Alfred Larsen and Sarah Larsen, husband and wife, executed and delivered an oil and gas lease to Stanolind Oil and Gas Company. The lease, which was for a primary term of ten years, covers the oil and gas leasehold estate in and under approximately 720 acres of land in Burke County. That land is legally described as follows:

> *"Township 163 North, Range 90 West*
> Section 22   SE ¼
> Section 23   W ½, W ½ SE ¼, SE ¼ SE ¼
> Section 24   SW ¼ SW ¼
> Section 25   W ½ NW ¼"

The #1 Alfred Larsen well was spudded in on the Northwest Quarter of the Southeast Quarter (NW ¼ SE ¼) of Section 22 on July 24, 1958, and was completed as a producing well on August 22, 1958. It is a Madison well in the Stony Run Field and was drilled to a depth of 5,600 feet. Except for the #1 Alfred Larsen well, no other wells have been drilled on the lease. The well is a "stripper" well in an 80-acre spacing unit. The present operator of the well is the defendant Earl Schwartz.

The appellees [Larsens] acquired the oil and gas estate by virtue of a contract for deed from Alfred Larsen and a subsequent warranty deed dated February 16, 1980.

No minerals were reserved in the conveyance.

On March 29, 1956, Stanolind assigned to Hunt Oil Company [Hunt] its interest in the Southeast Quarter (SE ¼) of Section 22 and the West Half (W ½) of Section 23. On May 22, Hunt assigned all of its interest to I.J. Wilhite, insofar as the lease covered the East Half of the Southeast Quarter (E ½ SE ¼) of Section 22 and the East Half of the Southwest Quarter (E ½ SW ¼) of Section 23 to a depth of 6,110 feet. Hunt reserved a one-sixteenth of the seven-eighths overriding royalty. On October 13, 1958, Hunt assigned to Wilhite all of its remaining interest in the lease [the West Half of the Southeast Quarter (W ½ SE ¼) of Section 22 and the Northwest Quarter, West Half of the Southwest Quarter (NW ¼, W ½ SW ¼) of Section 23] down to a total depth of 5,775 feet. Hunt reserved an overriding royalty of three-sixty-fourths of the seven-eighths and all rights below 5,775 feet. Hunt assigned all of its remaining interest to the defendant, Prosper Energy Corporation, on December 30, 1977. Thus, Prosper has no working interest in the #1 Alfred Larsen well, which was drilled to a depth of 5,600 feet, but only an overriding royalty based upon production from the well. Further, as far as the deep rights are concerned, Prosper has only a 25 percent working interest. None of the other working interest owners were joined in the lawsuit insofar as it sought to cancel the oil and gas lease as to the deep rights.

As in the Olson lease, there has been no exploration or development of the leasehold since the #1 Alfred Larsen well was drilled in 1958.

The appeals in these cases were taken by Vern Lund and Prosper Energy Corporation. Earl Schwartz did not appeal.

The issues raised by appellants in these appeals are identical:

(1) Did the trial court err in finding that there had been an abandonment of the undeveloped portions of the leaseholds, and

(2) Did the trial court err in failing to rule on the plaintiffs' claims of breach of implied covenants and in not ordering judgment in favor of the lessees on that issue?

In its memorandum opinion, the district court found that there had been an abandonment of those portions of the above described leases outside of the spacing units on which the producing wells were located and ordered the leases over these undeveloped portions of the lands canceled.

### III

### ABANDONMENT

The principal question before us concerns the doctrine of abandonment. Olson and Larsen argue that where there has been a long failure to explore or drill on available portions of an oil and gas lease, and where the lessees have no present intention of developing those portions of the leasehold, there is a legal presumption that the lessees have abandoned those portions even though no physical relinquishment has been shown. Lund and Prosper, on the other hand, argue that the leases are maintained over the entire acreage of their respective leaseholds by production from the stripper wells. They further contend that cancellation of a portion of a leasehold under these circumstances can only be granted upon proof of breach of implied covenants, following notice and demand. The district court adopted the theory urged by the lessors.

Each lease contains a *habendum* clause, which provides:

"It is agreed that this lease shall remain in force for a term of ten years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

Oil was produced from the leased premises within the ten-year primary terms of the leases. The wells have been producing in paying quantities since that time. Although production from these wells is marginal (less than ten barrels per day), it is sufficient to meet the costs of production and provide a royalty to the mineral interest owners. The express terms of the leases have thus been fulfilled and the entire acreage covered by both leases has been held since 1958 by marginal production.

The district court based its finding of abandonment on three undisputed facts:

(1) There had been no attempt at further development of either lease in over twenty years;

(2) Neither lessee has any present intention to drill an additional well on an available spacing unit because there is no indication that such a well would be profitable;

(3) Both lessees wish to hold the undeveloped portions on speculation that operations might prove profitable in the future.

The court also held that, in North Dakota, a finding of abandonment may be based upon intention alone—that physical relinquishment is not a requisite.

The authority relied upon by the district court, and by the lessors, is a statement by this court in *Hermon Hanson Oil Syndicate v. Bentz*, 77 N.D. 20, 40 N.W.2d 304, 306 (1949):

"Unless it appears either by direct evidence or preponderant circumstances that the lessee intended to abandon his lease, the courts will not declare it terminated on that ground. Intention of the lessee to abandon an oil lease is a requisite. *Rea v. Glenn*, 133 Cal.App. 82, 24 P.2d 204; *Thornton v. Phelan*, 65 Cal. App. 480, 224 P. 259; *Luman v. Davis*, 108 Kan. 801, 196 P. 1078; *Ball v. Ball*, 137 Misc. 693, 244 N.Y.S. 300; *Cleveland Stone Co. v. Hollingworth*, 63 S.D. 586, 262 N.W. 171; *Boatman v. Andre*, 44 Wyo. 352, 12 F.2d 370."

Neither *Hermon Hanson Oil Syndicate, supra,* nor the cases cited in that opinion support the proposition that abandonment can be established without evidence of physical relinquishment.

In *Rea v. Glenn*, 133 Cal.App. 82, 24 P.2d 204 (1933), the California Court affirmed a finding of abandonment of an oil

and gas lease. In that case the defendants ceased operation of a well, cleaned out the well, and removed the tools. The defendants also testified that, at the time in question, "the operations were entirely abandoned". *Rea, supra* 24 P.2d at 205. The California Court stated that abandonment

"... whether it is a complete abandonment or a cessation of operations with intention of never resuming, is always one of act and intent". *Id.* 24 P.2d at 206.

The acts of the defendants in *Rea* included acts of physical relinquishment.

In *Thornton v. Phelan*, 65 Cal.App. 480, 224 P. 259 (1924), a California Court held that the evidence was insufficient to establish abandonment of a mining claim. In that case the Court stated that:

"... abandonment is a question of intention, and that abandonment may be proved by the acts and conduct of the party alleged to have abandoned the property in controversy. The burden also rests upon the party alleging abandonment to prove the same by satisfactory and competent evidence." *Id.* 224 P.2d at 260.

This statement by the California Court leaves open the question of what is "satisfactory and competent evidence" of intention to abandon. In *Thornton*, the defendant mining company failed to perform required assessment work on the claims during the years 1917, 1918, and 1919 and further forfeited its right to do business in California because of its failure to file corporation income taxes in 1915. It also appears that from 1917 through 1919 no work was done on the claim by the defendant. The Court nevertheless held the evidence insufficient to constitute abandonment.

In the third case cited in the quoted portion of *Hermon Hanson Oil Syndicate, supra—Luman v. Davis*, 108 Kan. 801, 196 P. 1078 (1921)—the Kansas Supreme Court reversed the judgment of the district court canceling an oil and gas lease. The Kansas Court stated that:

"Abandonment depends on intention and conduct, and the conduct charged, stand-

ing alone, does not negative intention to fulfill the purpose of the grant." *Id.* 196 P. 1079.

The conduct complained of by the plaintiff was the defendants' "removing all of their machinery, casing and property from the same [the premises described], without any productive development thereon". *Id.*

In *Ball v. Ball*, 137 Misc. 693, 244 N.Y.S. 300, 303 (1930), a New York Court discussed the theory of abandonment in regard to an oil and gas lease, as follows:

"If there was an abandonment, it must be one by operation of law to be implied from the facts showing such intention. I do not think the evidence is sufficient to establish this claim. The lease was always in the possession of the defendants or their assignors. It was never canceled or surrendered in fact. There was no relinquishment of the premises by the corporate defendants. There was no acceptance of abandonment or surrender, and no resumption of possession by any act of the lessor-plaintiff. These are the requisite elements of abandonment to constitute surrender by operation of law."

In *Cleveland Stone Co. v. Hollingworth*, 63 S.D. 586, 262 N.W. 171, 173 (1935), the South Dakota Supreme Court stated, in regard to an oil and gas lease, that:

"Abandonment is a question of intention, and may be established by evidence, such as the removal of machinery, quitting the premises, and other circumstances showing an intention to relinquish all rights and interests in the leased premises."

In *Cleveland Stone Co.* the defendant has ceased drilling operations, all machinery and equipment had been removed and sold, and, subsequently, there had been no work on or development of the premises. These facts were held to be sufficient to establish abandonment.

In *Boatman v. Andre*, 44 Wyo. 352, 12 P.2d 370, 375 (1932), the evidence of abandonment was that:

"... neither the defendant nor his company ... had funds to go on with the drilling of the well they had commenced, but had not completed; that they endeavored for a while to obtain those funds or to get others to take over the work; that they wholly failed in this endeavor; that they were served with cancellation notice relative to the lease of the land on which all their operations had been conducted; that the Osage-Wyoming Oil Company then sold to another every item of personal property it had in this state, including its drilling rig on said lease, with its appurtenances, tools, and casing; that said company unqualifiedly transferred said lease, as well as all its interest in all other leases which it held on the geological oil structure the leases were given to develop ...."

None of the cases which were cited in *Hermon Hanson Oil Syndicate, supra,* and discussed above support the lessors' argument that evidence of physical relinquishment is not necessary to prove abandonment of an oil and gas lease. Each of the cases discussed required acts of physical relinquishment to sustain a finding of abandonment. In some cases relinquishment was viewed as a separate element of abandonment (*e.g., Rea v. Glenn, supra; Lumen v. Davis, supra*); and in others the acts of relinquishment were viewed as proof of intention to abandon (*e.g., Thornton v. Phelan, supra; Ball v. Ball, supra; Cleveland Stone Co., supra; Boatman v. Andre, supra*). The distinction between the two approaches is one of form rather than of substance. Evidence of acts of physical relinquishment was required in each case.

In *Hermon Hanson Oil Syndicate, supra,* we adopted the approach of the Oklahoma courts as set forth in *Doss Oil Royalty Co. v. Texas Co.,* 192 Okl. 359, 137 P.2d 934, 938 (1943), wherein the Oklahoma Supreme Court stated that the doctrine of abandonment is "to be applied in cases where intention to abandon is accompanied by physical relinquishment".

In the instant case the facts as set forth in the district court's memorandum opinion establish neither an intention to abandon nor a physical relinquishment. The mere non-use of a portion of a leasehold which is held by production is not sufficient to establish intent to abandon the lease. The trial court found that the lessees have no present intention of drilling because there is no indication that such drilling would result in production of oil and gas in paying quantities. Rather, the trial court found that the lessees wish to hold the leases for speculative purposes in hopes that something might occur which would indicate that additional drilling might prove profitable. Such intentions are logically inconsistent with the trial court's determination that the lessees intended to abandon the leases. The lessees are simply relying upon the prudent operator rule of not drilling when it is not economically feasible. The evidence in this case is insufficient to sustain a finding of abandonment on the part of either Lund or Prosper.

IV

IMPLIED COVENANTS

This brings us to the second issue raised by the lessors in this case: Did the district court err in failing to rule on the issue of whether or not the lessees had breached the covenant of reasonable development implied in the leases?

It is well settled that the lessee of an oil and gas lease has an implied obligation to the lessor to do everything that a reasonably prudent operator would do in operating, developing, and protecting the property, with due consideration being given to the interests of both the lessor and the lessee, if there is no express clause in the lease relieving the lessee of this implied duty. *Feland v. Placid Oil Co.,* 171 N.W.2d 829, 835 (N.D.1969). *See also* 38 Am.Jur.2d *Gas and Oil* § 127, page 601. This obligation is implied from the relation of the parties and the object of the lease;

and is not abrogated by the expiration of the primary term of ten years.

The leading case discussing these implied obligations is *Brewster v. Lanyon Zinc Co.*, 140 F. 801 (8th Cir.1905). In that case the Eighth Circuit Court of Appeals stated that:

> "The implication necessarily arising from these provisions—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor."

The United States Supreme Court, in *Sauder v. Mid-Continent Petroleum Corporation*, 292 U.S. 272, 281, 54 S.Ct. 671, 674, 78 L.Ed. 1255 (1934), applied the principles of the *Brewster* case, *supra*, to facts not unlike those of the case at bar:

> "The production of oil on a small portion of the leased tract cannot justify the lessee's holding the balance indefinitely and depriving the lessor, not only of the expected royalty from production pursuant to the lease, but of the privilege of making some other arrangement for availing himself of the mineral content of the land."

The Oklahoma case of *Doss Oil Royalty Co.*, *supra*, parallels the one at bar. In that case the lessee had not drilled a single well on substantial unexplored portions of the leasehold for over fourteen years. The lessee argued, as do the lessees in the instant case, that it was entitled to hold the whole of the lease because of production on part of the leasehold and, further, that there was no indication that a well on the undeveloped portion would prove profitable. In response to this contention the Oklahoma Supreme Court, in *Doss Oil Royalty Co.*, *supra* 137 P.2d at 936, stated that:

> "If ... [lessee's] theory is correct, it may hold the land without further develop-

ment as long as production from the present wells continues in paying quantities, regardless of how long that may be. The courts and text writers condemn such attempts of lessees to so indefinitely freeze the undeveloped portions of oil and gas leases, hold them for speculative purposes, and thus prevent the owners from getting full development of their land....

> "The courts of most states, under the facts alleged and proved by plaintiff, would grant some relief. Though the results reached are the same, the courts grant relief under such circumstances upon varying theories."

In North Dakota, as in Oklahoma, a lessor may be entitled to relief under these facts upon the theory of breach of the implied covenant of reasonable development.

■ As we stated previously, the question of whether or not there has been reasonable development of a leasehold is determined by reference to the "prudent operator" standard. It is impossible to state a formula by which a court can determine whether a particular lessee has developed a particular lease in conformity with the prudent operator standard. Each case must be decided on the facts peculiar to it and the burden of proving a breach of the implied covenant is on the party asserting it.

In *Sanders v. Birmingham*, 214 Kan. 769, 522 P.2d 959, 966 (1974), the Kansas Supreme Court listed a number of factors considered by the courts in applying the prudent operator standard. These include: (1) the quantity of oil and gas capable of being produced as indicated by prior exploration and development; (2) the local market and demand therefor; (3) the extent and results of the operations, if any, on adjacent lands; (4) the character of the natural reservoir—whether such as to permit the drainage of a large area by each well; (5) the usages of the business; (6) the cost of drilling, equipment, and operation of wells; (7) the cost of transportation, storage, and the prevailing price, and (8)

general market conditions as influenced by supply and demand or by regulation of production through governmental agencies.

■ We add to these factors evidence of the willingness of another operator to drill on the tract in question, *Berry v. Wondra*, 173 Kan. 273, 246 P.2d 282 (1952); the attitude of the lessee toward further development, *McMahan v. Boggess*, 302 S.W.2d 592 (Ky.1957); and the elapsed time since drilling operations were last conducted. *Texas Consolidated Oils v. Vann*, 208 Okl. 673, 258 P.2d 679, 680 (1953). See also Martin, *A Modern Look at Implied Covenants to Explore, Develop, and Market under Mineral Leases*, 27 Institute on Oil & Gas Tax Law and Taxation 177, 181–182 (1976).

■ There was considerable evidence presented at trial relating to a number of the factors listed above. The court did not expressly rule on the question of breach of implied covenant. Although language contained in the memorandum opinion implied that such a breach had in fact occurred, that opinion contains no specific findings of fact which might support such a conclusion.

■ An additional barrier to our affirmance of the district court's decrees in these cases is the apparent lack of notice and demand. It is a well-settled rule of oil and gas law that before a court of equity will grant a forfeiture the lessor must first give notice of the breach and demand that the terms of the implied covenant be complied with within a reasonable time. *Hermon Hanson Oil Syndicate, supra* 40 N.W.2d at 307–308. *See also Superior Oil Company v. Devon Corporation*, 604 F.2d 1063, 1069 (8th Cir.1979), and cases cited therein.

The only formal attempt at communication between Olson and Lund regarding production on the Olson Lease was a letter dated March 25, 1981, from Olson's attorney to Lund. The letter states in relevant part:

"We are satisfied that the implied covenant to develop the acreage has never been fulfilled and consequently I have been requested to demand upon you that you surrender and release any interest you might have in and to the foregoing Oil & Gas Lease insofar as the same covers the E ½ NE ¼ and all of the SE ¼ in Sec. 18, Township 162 North, Range 90 West. I am certain you recognize that it is the obligation of the holder of an Oil and Gas Lease to develop the entire acreage covered by an Oil & Gas Lease or else the undeveloped acreage so that the mineral owner can undertake exploration on his own.

"It is essential that you give this matter your immediate attention, otherwise we have been instructed to proceed with an appropriate action to terminate this Oil and Gas Lease."

A similar letter was sent from the Larsens' attorney to Prosper Energy Corporation. That letter states, in relevant part:

"Our primary concerning [*sic*] is the release of the undeveloped acreage covered by this lease which would be the lands in Sec. 23, Sec. 24, and Sec. 25. It would appear that the holder of the Oil and Gas Lease has had in excess of 22 years to develope [*sic*] these lands and consequently there can be no question that the undeveloped acreage should be released at this time."

■ The quoted language cannot be construed as notice of a breach of implied covenant and demand for further production. Rather, these letters constitute a demand for forfeiture of the respective leases. Such a demand is not authorized by any forfeiture provisions contained in the leases, nor are the lessors entitled to this relief until they have made proper demand and given the lessees a reasonable opportunity to pursue further development. *Hermon Hanson Oil Syndicate, supra* 40 N.W.2d at 308.

We have concluded that the evidence in these cases is insufficient to show abandonment of the leases. Each lease does, however, carry an implied covenant of reasonable development, a breach of which is ground for applying to a court of equity for

a forfeiture of the lease. Before a lessor is entitled to that relief, he must show that he has made demand of the lessee to comply with the implied covenant and has allowed a reasonable time for such compliance. This is not to say that the lessor is the arbiter of reasonable development. Whether or not the lessee has developed the property as the reasonably prudent operator would is a question to be determined by the court in light of all surrounding circumstances.

For the reasons stated herein, the judgment of the district court is reversed.

SAND and PEDERSON, JJ., and DENNIS A. SCHNEIDER and JOEL D. MEDD, District Judges, concur.

JOEL D. MEDD and DENNIS A. SCHNEIDER, District Judges, sitting in place of ERICKSTAD, C.J., and VANDEWALLE, J., disqualified.

DENNIS A. SCHNEIDER, District Judge, specially concurring.

The opinion accurately sets out the facts and correctly states the law, particularly as to the implied covenant of reasonable development. Such a covenant has existed in North Dakota since *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 835 (N.D.1969).

Although I have a problem with the implied covenant, "the river has flowed too long [1] and is too deep [2]" for me to believe it can be changed now.

In 1969 in *Placid Oil*, supra, this Court said, in effect, that if the lease is silent on the subject, as a matter of law the lease (including one executed prior to *Placid Oil*, as are the instant cases) is subject to an implied covenant of further development.[3]

A covenant is simply a promise. The promise here can only be implied since it certainly wasn't a promise between the parties that was expressly set out in the lease. It therefore cannot be said with clear conviction that the promise was a consideration or part of the bargain struck between the parties.[4]

A lease is nothing more than a contract between the parties which contract contains certain bargained-for promises.

The implied covenant of reasonable development [5] is nothing more than a judge-

---

**1.** *Brewster v. Lanyon Zinc Co.*, 140 F. 801 (8th Cir.1905).

**2.** "The law dealing with the implied covenant to drill additional wells is monumental in volume, and the Federal and State Reports from all oil and gas producing jurisdictions are replete with cases on the question." *Clayton v. Atlantic Refining Co.*, 150 F.Supp. 9, 13 (D.N.M.1957). See also Merrill, *Covenants Implied in Oil and Gas Leases* (2d Ed.1940 and 1964 Supp.); Williams and Meyers, *Oil and Gas Law*, Sections 801–878; Summers, *Oil and Gas*, Sections 395–416; Brown, *The Law of Oil and Gas Leases*, (2d Ed.Rev.1973).

**3.** Leases executed in later years in this state and now almost exclusively avoid this problem by use of the Pugh clause:

Notwithstanding the provisions of this lease to the contrary, this lease shall terminate at the end of the primary term as to all of the leased land except those within a production or spacing unit prescribed by law or administrative authority on which is located a well producing or capable of producing oil and gas or on which lessee is engaged in drilling or reworking operations.

This clause is basically designed to benefit a lessor who is executing a single oil and gas lease

encompassing large acreage. It gives the lessor the assurance that development and production will occur or the unexplored acreage will be released, the precise problem in the instant cases. Another alternative is to execute several oil and gas leases so that each lease is viewed independently and production will only hold the producing lease.

**4.** The only recitation in the leases dealing with production is found in the *habendum* clause:

It is agreed that this lease shall remain in force for a term of ten years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee.

**5.** While there are many implied covenants in mineral leases, there are generally six categories:
1. The implied covenant to drill an initial exploratory well;
2. The implied covenant to protect against drainage;
3. The implied covenant to use reasonable care in producing the minerals;
4. The implied covenant of reasonable development;
5. The implied covenant of further exploration;

made decision in equity which the judges then call a rule of law. This "fair sounding" rule has, over the years, spawned its own share of litigation until, it appears to me, this implied covenant is viewed as having its own separate existence in oil and gas law rather than contract law.

Would the legislature run afoul of the Impairment of Contracts provision of the Constitution[6] if it enacted a statute which said: there shall be, because of this enactment, in all oil and gas leases executed prior to this statute, an obligation on the part of the lessee to do everything that a reasonably prudent operator would do in operating, developing, and protecting the property, with due consideration being given to the interests of both the lessor and the lessee.

Probably, because the law may well change the contract between the parties, i.e., the bargained-for promises.

If such a statute would be constitutionally infirm, can it not be said that an identical judge-made rule of law is equally infirm?

Again, another example may illustrate my lingering doubts.

Assume the lessors in these cases were to bring an action in the district court to reform the lease to have the implied covenant actually written into the lease (Sections 9–03–13 or 9–03–14, NDCC) or an action to rescind the lease because the covenant was not expressly set out in the lease (Section 9–09–02, NDCC).

In such a case, the trial court would of necessity, among other aspects, look at the consideration of the original contract and the mutual promises made between the parties at the time of the contract. It is reasonably safe to conclude that a promise of reasonable development or to further explore was not part of the original contract or consideration. The only promise that we can be sure of is that promise

found in the *habendum* clause which states that if oil is produced on *any part* of the leased acreage, the lease would continue as to *all* of the acreage even past the primary term of the lease.

Such is the promise here between the parties and is what the parties bargained for in 1949, two years before oil was discovered in North Dakota in paying quantities.

The judge-made rule of equity called the implied covenant of reasonable development changes that bargain.

And that rule is too ingrained to judicially change now.

SAND, J., concurs.

---

6. The implied covenant to market the product.
Martin, *A Modern Look at Implied Covenants to Explore, Develop, and Market under Mineral Leases,* 27 Institute on Oil and Gas Tax Law and Taxation, 177, 179 (1976).

**6.** No bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed. N.D. Constitution, Article 1, Section 18.