964 F.2d 732
 DAKOTA GASIFICATION COMPANY, in its own capacity as
successor-in-interest to the Department of Energy
and Great Plains Gasification Associates,
United States of America, on behalf of The Department of
Energy, Appellant,
v.
NATURAL GAS PIPELINE COMPANY OF AMERICA; ANR Pipeline
Company, Michigan-Wisconsin Pipe Line Company;
Transcontinental Gas Pipe Line Corporation; Tenneco Gas
Pipeline Group, formerly known as Tennessee Gas Pipeline
Company, Appellees.
DAKOTA GASIFICATION COMPANY, in its own capacity as
successor-in-interest to the Department of Energy
and Great Plains Gasification
Associates; Appellant,
United States of America, on behalf of The Department of Energy,
v.
NATURAL GAS PIPELINE COMPANY OF AMERICA; ANR Pipeline
Company, Michigan-Wisconsin Pipe Line Company;
Transcontinental Gas Pipe Line Corporation; Tenneco Gas
Pipeline Group, formerly known as Tennessee Gas Pipeline
Company, Appellees.
 Nos. 91-1671, 91-1677.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 11, 1991.
Decided May 4, 1992.
 
 MaryJane Reynolds, Washington, D.C., argued (Stuart M. Gerson, Stephen D. Easton, J. Christopher Kohn, John W. Showalter, Allen L. Lear and Carlos T. Angulo, on the brief), for appellant.
 Carter G. Phillips, Washington, D.C., argued, for appellees.
 Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 In the early 1980s, a partnership known as Great Plains Gasification Associates built a coal gasification plant in North Dakota to manufacture synthetic natural gas. The partnership consisted of four pipeline companies, ANR Pipeline Company, Natural Gas Pipeline Company of America, Tennessee Gas Pipeline Company, and Transcontinental Gas Pipe Line Corporation (collectively "the Pipelines"), and an additional investor. Each of the Pipelines signed a Gas Purchase Agreement with the partnership to purchase a pro rata share of the plant's entire output of synthetic gas at a specified price. Each Gas Purchase Agreement contained an identical arbitration clause.[1]
 
 
 2
 The partnership provided $536 million in equity contributions to finance the gasification plant, but its construction was largely financed by a $1.5 billion loan guaranteed by the Department of Energy and secured by a mortgage on the plant. To gain this guarantee, the Pipelines entered into a security agreement known as the Pipeline Affiliates Agreement with the Department of Energy. Entry into the Pipeline Affiliates Agreement was expressly recognized in that agreement as a "condition precedent" for the Secretary's issuance of the $1.5 billion guarantee supporting the partnership's financing. Among other things, the Pipeline Affiliates Agreement contained a forum selection clause[2] and stated that if the partnership terminated its Gas Purchase Agreements with the Pipelines, the Gas Purchase Agreements would be reinstated between the Pipelines and the Secretary of Energy, who would assume the role formerly held by the partnership.[3] The Gas Purchase and Pipeline Affiliates Agreements were both executed on January 29, 1982.
 
 
 3
 During the following years, the price of natural gas in the open market plummeted. In 1985, the partnership defaulted on the loan. The Department of Energy honored its guarantee and sought to foreclose on the mortgage and, more importantly, to enforce the Gas Purchase Agreements by reinstating their conditions with the government in the role formerly held by the partnership. When the Pipelines contested the Department of Energy's actions, the government filed suit in federal court to compel the Pipelines' compliance with the Gas Purchase Agreements. The United States District Court for the District of North Dakota granted summary judgment in favor of the Department of Energy, ruling that it legitimately assumed control of the plant and that the Pipeline Affiliates Agreement obligated the Pipelines to continue purchasing 100 percent of the synthetic gas produced by the plant. This court affirmed. See United States v. Great Plains Gasification Assocs., 819 F.2d 831 (8th Cir.1987); and United States v. Great Plains Gasification Assocs., 813 F.2d 193 (8th Cir.1987), cert. denied, ANR Gasification Properties Co. v. United States, 484 U.S. 924, 108 S.Ct. 285, 98 L.Ed.2d 245 (1987).[4]
 
 
 4
 The Department of Energy operated the gasification plant until October 1988, at which time Dakota Gasification Company purchased the assets of the plant as well as the Department of Energy's rights under the reinstated Gas Purchase Agreements. Each of the Gas Purchase Agreements contain assignment clauses entitling Dakota to the rights of its predecessor-in-title, the Secretary of Energy.[5] Although the Department of Energy did not assign the Pipeline Affiliates Agreement to Dakota, by its own terms, that agreement provided: "This Pipeline Affiliates Agreement shall enure to the benefit of, and be binding upon, successors and permitted assigns." Dakota paid $75 million in cash for these rights and pledged approximately $1.6 billion in future payments to the government, which were to be paid out of the revenues generated by the plant's operation over the following eighteen years.
 
 
 5
 Soon after Dakota assumed control of the plant, disputes arose between the Pipelines and Dakota with respect to the Pipelines' obligations under the Gas Purchase Agreements. Dakota and the United States[6] filed suit in the United States District Court for the District of North Dakota seeking to resolve the disputes.[7] The Pipelines objected to the jurisdiction of the federal court, contending that the disputes were subject to arbitration under the Gas Purchase Agreements. The Pipelines reasoned that if the purchase obligations of the Gas Purchase Agreements were valid and binding as Dakota argued, then the arbitration clauses in the agreements were equally valid and binding and could not be ignored. The district court found this logic "impeccable" and dismissed Dakota's action. The district court, however, characterized its decision as setting the stage for "utter chaos," since it realized that its ruling would force Dakota "into four separate arbitration proceedings, in four separate locations, with separate arbitrators, [and] could produce four disparate decisions, each of which would be unappealable and final according to the contract language." Dakota and the United States appeal. We reverse.
 
 DISCUSSION
 
 6
 This case turns on conflicting provisions from two separate agreements. The question presented is whether the disputes underlying this appeal must be arbitrated or litigated.
 
 
 7
 We first note that the conflicting documents, the Gas Purchase Agreements and the Pipeline Affiliates Agreement, were simultaneously executed. Indeed, if the Pipelines had refused to sign the Pipeline Affiliates Agreement with the Secretary of Energy, their entering into the Gas Purchase Agreements with the partnership would have been an empty gesture. The government conditioned its guarantee of the gasification plant's financing on the Pipelines agreeing to the Pipeline Affiliates Agreement with the Secretary of Energy, and without the government's $1.5 billion guarantee, the project would have lost three-fourths of its funding. In a transaction where the execution of one contract depends upon the execution of other contracts--in this case, executing meaningful Gas Purchase Agreements required the Secretary's guarantee of the plant's financing, and to gain this guarantee the Secretary required the Pipelines to agree to the Pipeline Affiliates Agreement--the contracts must be interpreted collectively. Restatement (Second) of Contracts, § 202(2) (1981).[8]
 
 
 8
 "The courts have long recognized that a contract may consist of more than one instrument." St. Paul Fire & Marine Ins. Co. v. Tennefos Constr. Co., 396 F.2d 623, 628 (8th Cir.1968). Thus, as a rule of law, the Gas Purchase Agreements and the Pipeline Affiliates Agreement "should be read together as they represent successive steps which were taken to accomplish a single purpose." Id. This rule of interpretation applies even though the parties executing the contracts differ, as long as "the several contracts were known to all the parties and were delivered at the same time to accomplish an agreed purpose," id. (quoting Peterson v. Miller Rubber Co. of New York, 24 F.2d 59, 62 (8th Cir.1928)), and even though the contracts did not internally reference each other. Id. at 629. See also 4 Walter Jaeger, Williston on Contracts § 628, at 904 (3d ed. 1961) ("Even where a writing does not refer to another writing, if such other writing was made as part of the same transaction, the two should be interpreted together."). Indeed, hinging one contract upon the execution of another contract, as was the case here, heightens the need for joint interpretation. See LCI Communications v. Wilson, 700 F.Supp. 1390, 1395 (W.D.Pa.1988).[9] Given these rules of interpretation, under the facts of this case, we hold that if the Secretary or its successor-in-interest has a dispute with the Pipelines concerning the Gas Purchase Agreements, the former parties can successfully demand that the dispute be litigated in the designated federal courts. We reach this conclusion for two reasons.
 
 
 9
 First, as we have explained, the Department of Energy played an integral, and perhaps even a decisive, role in making the gasification plant a reality. Without the Secretary's guarantee of the $1.5 billion loan to the partnership, the plant most likely would not have been built. Before the Department of Energy committed the government to this guarantee, it required the Pipelines to sign the Pipeline Affiliates Agreement, which expressly stated that its execution was "a condition precedent to the issuance of the Guarantee by the Secretary," and that the parties (i.e., the Pipelines and the Secretary) "consent to the jurisdiction in any United States District Court ... in connection with any suit to enforce the rights of the Secretary hereunder."
 
 
 10
 In exchange for guaranteeing the financing which made the construction of the gasification plant possible, the Department of Energy required the Pipelines to simultaneously execute the Pipeline Affiliates Agreement with the Gas Purchase Agreements so as to secure certain rights for the government and its successors-in-interest. These rights included the prerogative to litigate disputes affecting the Secretary of Energy in federal court. We therefore conclude that under the Pipeline Affiliates Agreement, any dispute involving the Secretary of Energy's rights must be litigated in federal court, if the Secretary or the Pipelines so desire.
 
 
 11
 Second, Dakota bought the gasification plant and its related assets for $75 million plus a promise to pay the government approximately $1.6 billion out of the future revenues generated by the plant. The Pipeline Affiliates Agreement specifically provided that the government's benefits from the Pipeline Affiliates Agreement "shall enure to the benefit of ... successors." Each of the Gas Purchase Agreements contained assignment clauses entitling subsequent purchasers of the plant "to the rights ... of its predecessor in title." As we explained, under the Pipeline Affiliates Agreement, the Secretary contracted for the prerogative to litigate disputes affecting its rights (which includes the Gas Purchase Agreement obligations of the Pipelines) in designated federal courts. Both the Pipeline Affiliates Agreement and the Gas Purchase Agreements specifically provide that the government's successor-in-interest will inherit the government's rights. We therefore hold that the disputes underlying this appeal must be litigated in federal court.
 
 
 12
 The Pipelines raise numerous arguments that urge a different conclusion. Each of these arguments, however, ignore the conditions under which the Secretary of Energy agreed to guarantee the financing for the gasification plant. For instance, the Pipelines contend that they seek only to arbitrate disputes under the Gas Purchase Agreements and not under the Pipeline Affiliates Agreement, thereby rendering the forum selection clause from the Pipeline Affiliates Agreement irrelevant. The district court found this logic "impeccable." We disagree. This conclusion discounts the existence of the Pipeline Affiliates Agreement, however, and forgets that because the government conditioned its guarantee on the Pipelines first signing the Pipeline Affiliates Agreement, the Gas Purchase Agreements and the Pipeline Affiliates Agreement must be interpreted collectively, and not in isolation, particularly since the documents were simultaneously executed. See, e.g., St. Paul Fire & Marine Ins. Co. v. Tennefos Constr. Co., 396 F.2d 623, 628 (8th Cir.1968). This rule of contract interpretation is firmly rooted law, see 4 Walter Jaeger, Williston on Contracts § 628 (3d ed.1961) and 3 Arthur Corbin, Corbin on Contracts § 549 (2d ed.1960), and convinces us that under the facts of this case, the current disputes over the Gas Purchase Agreements must be litigated in federal court.
 
 
 13
 Accordingly, we reverse the district court's decision and remand for further proceedings consistent with this opinion.
 
 
 14
 MAGILL, Circuit Judge, dissenting.
 
 
 15
 I dissent from the majority's conclusion that the forum selection clause in the Pipeline Affiliates Agreement supersedes the arbitration clause in the Gas Purchase Agreements and the Transportation Agreements.[1] The Gas Purchase Agreements require each Pipeline to buy, and the partnership or its successors[2] to sell, a certain quantity and quality of synthetic gas. These agreements contain numerous provisions governing this buyer-seller relationship, including an arbitration clause. The Transportation Agreements contain additional provisions governing the buyer-seller relationship, and also include an arbitration clause. The Pipeline Affiliates Agreement, on the other hand, relates to the Secretary of Energy's guarantee of the loan made to the partnership. This agreement contains a number of covenants, representations, and warranties made by the Pipelines to the Secretary that decrease the Secretary's risk as guarantor. One covenant is that the Pipelines will reinstate the Gas Purchase Agreements with the Secretary as seller if the partnership defaults on its loan and the Secretary, as guarantor, takes over the coal gasification plant.[3] This agreement also contains a forum selection clause which reads: "The parties hereto consent to the jurisdiction in any United States District Court located in the District of Columbia or North Dakota in connection with any suit to enforce the rights of the Secretary hereunder." J.A. at 45 (emphasis added).
 
 
 16
 The reference in the forum selection clause to "rights ... hereunder" arguably is ambiguous. In my opinion, the correct interpretation of this language is that the Secretary has the right to litigate in the specified federal courts those claims arising from the Pipelines' breach of any covenant, representation, or warranty contained in the Pipeline Affiliates Agreement. For example, because this agreement contains a covenant that the Pipelines will reinstate the Gas Purchase Agreements, the Secretary can bring an action in federal court to enforce this promise. Once the Gas Purchase Agreements are reinstated, however, the parties must arbitrate any dispute regarding their rights and obligations under these agreements. See Transcontinental Gas Pipeline Corp. v. Dakota Gasification Co., 782 F.Supp. 336, 341-42 (S.D.Tex.1991) (also interpreting these two agreements to require arbitration in a related matter). The majority, on the other hand, argues that because the Pipeline Affiliates Agreement is the vehicle through which the Secretary obtains rights under the Gas Purchase Agreements, the phrase "rights of the Secretary hereunder" includes its rights under the Gas Purchase Agreements. Under this interpretation, the arbitration clause in the Gas Purchase Agreements is superseded by the forum selection clause when the government becomes the seller.[4]
 
 
 17
 I believe the majority's interpretation is incorrect for a number of reasons. First, the forum selection clause refers only to the "rights of the Secretary." The clause makes no reference to the rights of the Pipelines. The Gas Purchase Agreements, however, give the Pipelines numerous rights. Thus, if this clause were applied to the Gas Purchase Agreements, courts either would have to allow the Pipelines to arbitrate their claims under these agreements or would have to read into the forum selection clause a reference to the rights of the Pipelines. The former choice creates a conflict between arbitration and litigation whenever both the Secretary and the Pipelines claim that the other has violated their rights under the Gas Purchase Agreements. The latter choice is an inappropriate judicial rewriting of the contract. Neither of these problems would exist if, as I suggest, the forum selection clause were applied only to actions claiming a breach of a covenant, representation, or warranty contained in the Pipeline Affiliates Agreement. Under this interpretation, the failure of the forum selection clause to mention the Pipelines does not create a problem because the Pipeline Affiliates Agreement does not give the Pipelines any rights.
 
 
 18
 Second, in another provision of the Pipeline Affiliates Agreement, each Pipeline represents that there is no litigation pending that threatens its ability "to perform its obligations hereunder or under the Gas Purchase Agreement to which it is a party." J.A. at 43 (emphasis added). This provision makes it clear that the Pipelines have certain obligations under the Pipeline Affiliates Agreement and certain obligations under the Gas Purchase Agreements. Likewise, the Secretary must have certain rights under each, and use of the term "hereunder" refers only to its rights under the Pipeline Affiliates Agreement.
 
 
 19
 Third, the clause in the Pipeline Affiliates Agreement that reinstates the Gas Purchase Agreements in no way qualifies this reinstatement. In fact, this clause provides that the Pipelines "will continue to take or pay for gas as provided [ ]under [the Gas Purchase Agreements] on the same terms as were in effect prior to such termination and reinstatement...." The arbitration clause clearly was a term in effect prior to reinstatement.
 
 
 20
 Fourth, it seems highly unlikely that the Pipeline Affiliates Agreement would eliminate the arbitration clauses without even mentioning their existence. If the parties had intended such an outcome, they easily could have done so in a more straightforward manner.
 
 
 21
 This brings me to the fifth, and perhaps most compelling, reason why the majority's interpretation of these agreements is wrong--the majority has ignored the federal policy favoring arbitration. The United States Supreme Court has articulated this policy as follows:
 
 
 22
 The Arbitration Act[, 9 U.S.C. §§ 1-208 (1988),] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.
 
 
 23
 Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); see also, e.g., I.S. Joseph Co. v. Michigan Sugar Co., 803 F.2d 396, 399 (8th Cir.1986) (recognizing this federal policy). The Pipeline Affiliates Agreement does not, by any stretch of the imagination, clearly provide that, upon reinstatement of the Gas Purchase Agreements by the Secretary, the forum selection clause will replace the arbitration clause in these agreements.[5] As noted, it is, at most, ambiguous. Thus, the federal policy favoring arbitration mandates that this ambiguity be resolved in favor of enforcing the arbitration clauses. See Patten Sec. Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400, 406-07 (3d Cir.1987) (resolving a dispute between an arbitration clause and a forum selection clause in favor of arbitration even though the forum selection clause did not serve an independent purpose as it does in this case).
 
 
 24
 For the above reasons, I am convinced that the majority has erroneously concluded that the forum selection clause supersedes the arbitration clause contained in the Gas Purchase Agreements and Transportation Agreements. Because these agreements require arbitration, I would affirm the district court's dismissal of the current litigation. See Dakota Gasification Co. v. ANR Pipeline Co., No. A1-90-227 (D.N.D. Jan. 11, 1991).
 
 
 
 [1]
 Article XVIII of each Gas Purchase Agreement provides:
 Any dispute between the parties arising out of this Agreement (including failure to agree on matters stated to be determined by mutual agreement) shall be tried by arbitration pursuant to the Rules of the American Arbitration Association in effect at the time of such arbitration.
 
 
 [2]
 As part of the Pipeline Affiliates Agreement, each of the four pipelines agreed:
 The parties hereto consent to the jurisdiction in any United States District Court located in the District of Columbia or North Dakota, in connection with any suit to enforce the rights of the Secretary hereunder.
 The Pipeline Affiliates Agreement further provided:
 The rights and obligations of the parties hereunder shall be governed by and construed and interpreted in accordance with the federal laws of the United States....
 
 
 [3]
 The relevant clause of the Pipeline Affiliates Agreement provided:
 In the event of a termination of the Gas Purchase Agreement to which such Pipeline Affiliate is a party as a result of any default by [the partnership] thereunder, such Pipeline Affiliate will ... promptly reinstate such Gas Purchase Agreement with the Secretary or his designee ... taking the place of [the partnership], and will continue to take or pay for gas as provided thereunder on the same terms as were in effect prior to such termination and reinstatement, without penalty, upon such notice to it that the Secretary or his designee is taking over the Project and will be performing the obligations of [the partnership] under such Gas Purchase Agreement.
 
 
 [4]
 Only ANR appealed this court's decisions to the Supreme Court
 
 
 [5]
 The Gas Purchase Agreements state:
 "Any entity which shall succeed by purchase ... to the properties ... shall be entitled to the rights and shall be subject to the obligations of its predecessor in title...."
 
 
 [6]
 Because of its $1.6 billion interest in the continuing profitability of the gasification plant, the United States successfully moved to intervene and join Dakota
 
 
 [7]
 In its complaint, Dakota sought a ruling outlining the Pipelines' purchase obligations under the Gas Purchase Agreements
 
 
 [8]
 Although the parties do not raise any choice of law issues, we note that North Dakota adheres to the position adopted by the Restatement. See N.D. Cent.Code § 9-07-07 (1991)
 
 
 [9]
 We note that under North Dakota law, "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." N.D. Cent.Code § 9-07-12 (1991). See also Sorenson v. Olson, 235 N.W.2d 892, 896 (N.D.1975) and supra note 8
 
 
 [1]
 The majority fails to note that the current dispute between the Pipelines and Dakota also includes issues arising under Synthetic Gas Transportation Agreements which each of the Pipelines and the partnership entered prior to foreclosure by the Secretary of Energy
 
 
 [2]
 Dakota is a successor to the partnership
 
 
 [3]
 Reinstatement of the Gas Purchase Agreements was by no means the only purpose served by the Pipeline Affiliates Agreement. The agreement contains numerous other substantive provisions including covenants that the Pipelines will use their best efforts to obtain regulatory approval and that they will not claim rights to any patents or technology resulting from their participation in the coal gasification process
 
 
 [4]
 The majority does not address the continued viability of the arbitration clause in the Transportation Agreements. I do not believe there is any way to interpret the forum selection clause in the Pipeline Affiliates Agreement as superseding these clauses. The Pipeline Affiliates Agreement was entered prior to the Transportation Agreements and makes absolutely no reference to them
 
 
 [5]
 The Secretary did not even assign its rights under the Pipeline Affiliates Agreement to Dakota. Rather, it assigned only the assets of the gasification facilities and its rights under the Gas Purchase Agreements and Transportation Agreements. This indicates that, until this dispute, the Secretary also did not view the forum selection clause as governing the relationship between the Pipelines and the seller of gas