# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1625
No. 00-1628

_____

ANR Western Coal Development    *
Company,    *
   *
     Appellant/Cross-Appellee,    *
   *    Appeal from the United States
v.    *    District Court for the
   *    District of North Dakota.
Basin Electric Power Cooperative;    *
The Coteau Properties Company;    *
Dakota Coal Company,    *
   *
     Appellees/Cross-Appellants.    *

_____

Submitted: June 13, 2001

Filed: January 10, 2002

_____

Before WOLLMAN, Chief Judge, BOWMAN and HAMILTON,[1] Circuit Judges.

_____

BOWMAN, Circuit Judge.

Basin Electric Power Cooperative, Dakota Coal Co., and The Coteau Properties Co. sued ANR Western Coal Development Co. (WCDC) in a dispute arising out of the development of coal fields to supply a gasification plant (Gas Plant) near Beulah,

_____

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

North Dakota.[2]  Basin, Coteau, and Dakota Coal sued WCDC in North Dakota state court in 1992; WCDC removed to the District Court and filed counterclaims.  The District Court granted summary judgment to Basin, Dakota Coal, and Coteau; we reversed and remanded for trial.  Basin Elec. Power Coop. v. ANR W. Coal Dev. Co., 105 F.3d 417 (8th Cir. 1997) (Basin I).  After our remand the District Court assigned the case to a Magistrate Judge who realigned the parties, positioning WCDC as the plaintiff, and tried WCDC's counterclaims.  The Magistrate Judge entered judgment for WCDC on its claim for breach of implied duty to reasonably develop and against WCDC on its claim for tortious interference with contract.

WCDC appeals and Basin, Coteau, and Dakota Coal cross-appeal from the judgment of the Magistrate Judge.  The case, in federal court on diversity jurisdiction, is governed by North Dakota law.  We affirm on the cross-appeal, but on the appeal we reverse and remand for further proceedings.

I.

Our previous opinion in this litigation sets forth its long and complicated history.  Id. at 420-22.  We recount much of it here to clarify the issues presented in the current appeal and cross-appeal.

In the early 1970s, WCDC's predecessor-in-interest[3] began pursuing a plan to construct several coal-gasification plants in North Dakota.  The initial stages of the

---

[2]This plant, the Great Plains Synfuels Plant, converts coal into synthetic gas. See Basin Elec. Power Coop. v. ANR W. Coal Dev. Co., 105 F.3d 417, 420 & n.2 (8th Cir. 1997) (Basin I).

[3]WCDC is the successor-in-interest to ANR Pipeline Company, formerly known as the Michigan-Wisconsin Pipeline Co., which was the pipeline subsidiary of the American Natural Resources Company (ANR).  ANR and its business partners initiated the Gas Plant project.

project required the acquisition of coal reserves dedicated to supplying the coal needs of the gasification plants. Thus, in 1972 WCDC's predecessor entered into an agreement with Coteau's parent company, the North American Coal Co. (NACCO), which required NACCO to set aside coal reserves under its control to be used exclusively to supply the future needs of the proposed plants. Specifically, the 1972 Basic Agreement obligated NACCO to dedicate certain coal reserves to WCDC and in return obligated WCDC to finance the acquisition and carrying costs of additional coal reserves necessary to meet the anticipated needs of the proposed plants. The parties to the 1972 agreement envisioned that Coteau would mine the dedicated reserves and supply the coal from them to the proposed plants.

After the 1972 agreement, plans for the construction and operation of the gasification plants moved forward. In 1979, WCDC and NACCO entered the first of three agreements implicated in this lawsuit. The 1979 Restatement of Basic Agreement superseded the 1972 agreement, but retained most of the major provisions of the original contract. It again obligated WCDC to fund the acquisition and carrying costs of the coal reserves near Beulah.[4] In return, the agreement entitled WCDC to receive an overriding royalty of forty cents per ton, to be adjusted for inflation, on all coal mined from the WCDC-funded reserves (royalty-bearing reserves). The agreement imposed upon Coteau the duty to pay this overriding royalty to WCDC. It also provided that WCDC would receive a delay-rental-payback

---

[4]WCDC agreed to pay acquisition costs including "salaries of employees directly engaged in acquisition, the purchase price of coal land acquired in fee, bonuses for leases, legal and other expense in establishing and reviewing titles, closing expenses, transfer taxes and, to the extent approved by [WCDC], drilling, engineering and testing costs." 1979 Restatement of Basic Agreement ¶ 5. The carrying charges WCDC agreed to pay included "delay royalties on coal and ad valorem taxes." Id.

payment of five cents per ton,[5] also to be adjusted for inflation, on a defined amount of coal produced from these reserves, as consideration for WCDC's fronting an amount that eventually totaled over $11 million dollars to NACCO to hold the coal reserves from the time of the 1972 agreement until the Gas Plant and its accompanying power plant (the Antelope Valley Station or AVS) were completed.[6] See 1979 Restatement of Basic Agreement ¶ 10(a). Moreover, the 1979 Restatement designated Coteau as holder of all deeds and leases on the dedicated coal reserves and limited Coteau's business activities to those set forth in the agreement. Id. at ¶¶ 4, 3. It is under this agreement that WCDC argues Coteau's implied duty to reasonably develop WCDC's royalty-bearing reserves first arose.

Basin and WCDC signed the second agreement central to this dispute in 1982. At the time, Basin was involved with the Gas Plant project through its construction

---

[5]Delay rentals are amounts paid to the holder of mining rights on an area of coal "for the privilege of deferring development of the property." 3 American Law of Mining §85.03[4], at 85-32 (The Rocky Mountain Mineral Law Found. eds., 2d ed. Supp. 1985). The parties' agreement thus provided that WCDC would eventually recover, in the form of a "delay-rental payback," the delay rentals it paid.

[6]Only the Gas Plant and AVS were ever completed. Because changing economic circumstances made the cost of producing the synthetic gas uneconomical, plans to build additional coal-gasification plants were abandoned. ANR eventually defaulted on its loans and, in 1986, the Department of Energy foreclosed on the plant. For a review of the litigation surrounding the foreclosure, see Dakota Gasification Co. v. Natural Gas Pipeline Co. of America, 964 F.2d 732 (8th Cir. 1992), cert. denied, 506 U.S. 1048 (1993); United States v. Great Plains Gasification Associates, 819 F.2d 831 (8th Cir. 1987); and United States v. Great Plains Gasification Associates, 813 F.2d 193 (8th Cir.), cert. denied, 484 U.S. 924 (1987). By the time of the foreclosure, the plant had entered into long-term supply contracts with purchasers of gas extending through 2009. The plant is still in operation, although the purchasers of the gas it produces are paying a fixed rate that is often higher than the market price for natural gas. Whether the plant will continue to operate after the expiration of these contracts in 2009 is unknown.

and operation of AVS. Basin negotiated a deal directly with WCDC whereby it paid $40 million to WCDC as a prepayment on the overriding royalty due on all coal mined by Coteau from the WCDC royalty-bearing reserves and delivered to AVS. The agreement, known as the 1982 Purchase Agreement, specified that this prepayment would exempt from WCDC's overriding royalty 5.2 million tons per year of coal mined from royalty-bearing reserves and "delivered to Basin Electric for the Antelope Valley Station," up to a maximum of 210 million tons over the life of the agreement. 1982 Purchase Agreement ¶¶ 1, 2. Basin's later imposition of a particular accounting method in an attempt to get full credit for coal delivered to AVS against the 5.2 million tons per year under the 1982 Purchase Agreement forms the basis for WCDC's claim of tortious interference with contract.

In 1987 the parties entered into the Coal Reserve Agreement, the final agreement implicated in this lawsuit. By 1987, WCDC no longer had an ownership interest in the Gas Plant, see supra note 6, and had little need for the vast coal reserves acquired as a result of and protected by the 1972 and 1979 agreements. Through other agreements, WCDC had already narrowed its obligations under the 1979 agreement to encompass only Mine Areas 1 through 4, also known as the Freedom Mine. The Coal Reserve Agreement superseded the 1979 agreement. It relieved WCDC of the obligation to fund any further carrying costs or acquisition of Freedom Mine reserves and relieved Coteau of the obligation to pay the overriding royalty to WCDC on any coal reserves acquired after March 2, 1987, the date of the agreement. Moreover, the agreement transferred to a third party (whose rights were eventually assumed by appellee Dakota Coal) all rights held by WCDC to direct Coteau in the acquisition and mining of the Freedom Mine and other reserves. Thus, WCDC retained only its right to receive the overriding royalty on coal Coteau held prior to March 2, 1987 and for which WCDC had paid carrying and acquisition costs. WCDC argues that Coteau's implied duty to reasonably develop WCDC's royalty-bearing reserves continued under the 1987 agreement.

In 1988, Basin purchased the Gas Plant from the Department of Energy (DOE) and created Dakota Coal to manage the Gas Plant's coal resources. At this time, Basin held the rights to the Dakota Star reserves, an area of coal contiguous to Mine Areas 1 through 4. Basin also operated the Leland Olds Station (LOS), a power plant located at another mine. Before purchasing the Gas Plant, Basin maintained a business relationship with Coteau based upon Basin's operation of AVS and Coteau's mining of the coal used to fuel AVS's operations. Once Basin learned it was the successful purchaser of the Gas Plant, and after discussing its plans with Coteau, Basin determined that it would incorporate the Dakota Star reserves into the Freedom Mine. Thus, Coteau arranged to purchase Dakota Star from Basin, incorporate it into the Freedom Mine, and supply coal to LOS and to the UPA Stanton Station (UPA) (which had been supplied with coal from soon-to-be-exhausted reserves also owned by Basin). Basin, pursuant to the rights it had obtained as owner of the Gas Plant to direct Coteau's mining through its newly created subsidiary Dakota Coal, directed Coteau to preferentially mine the Dakota Star reserves to supply LOS, UPA, and the Gas Plant. In Basin's notes from an April 1990 meeting between representatives of Basin and Coteau, the discussion summary states, "Meeting participants were also informed that the Dakota Star reserves should be utilized as much as practical to minimize overriding royalty payments to WCDC." Conference Notes prepared by Karl Lemmerman ¶ 2 (Apr. 17, 1990). WCDC points to this evidence as part of the basis for its claim that Coteau breached an implied duty to reasonably develop WCDC royalty-bearing reserves.

By 1993, Coteau was mining coal from the Freedom Mine and the Dakota Star reserves, commingling it, and delivering commingled coal to AVS, the Gas Plant, LOS, and UPA (collectively, the end users). Coteau could determine what percentage of the coal mined came from royalty-bearing reserves but could not identify how much royalty-bearing coal was actually delivered to each end user. Up to 5.2 million tons of royalty coal delivered to AVS per year were exempt from WCDC royalties under the 1982 Purchase Agreement, so the parties had to devise a method to

calculate the royalties owed to WCDC. After some discussion between WCDC and Coteau, and among Coteau, Basin, and Dakota Coal, Basin and Dakota Coal directed Coteau to use a deeming accounting method. Under the deeming method, all coal delivered to AVS would be deemed to have been mined from royalty-bearing reserves, regardless of its actual origin. The use of this accounting method substantially reduced WCDC's royalty payments on coal delivered to the Gas Plant, LOS, and UPA because Basin received credit against its royalty pre-payment on more royalty-bearing coal than was physically being delivered to AVS.

The decision to implement the deeming accounting method led Basin, Dakota Coal, and Coteau to file for a declaratory judgment in state court in 1992, seeking approval of their proposed method. WCDC removed the case to the District Court and filed counterclaims. The District Court granted summary judgment to Basin, Dakota Coal, and Coteau, essentially approving the deeming method. We reversed, and held that a pro-rata accounting method should have been employed. Basin I, 105 F.3d at 424. Under the pro-rata method, WCDC's royalties are calculated by assuming that the percentage of royalty-bearing coal eventually delivered to each end user is the same as the ratio of coal mined from the royalty-bearing reserves to all coal mined by Coteau. Thus, if fifty percent of all coal mined by Coteau comes from royalty-bearing reserves, then fifty percent of all coal delivered to each end user is assumed to be royalty-bearing coal.

After our remand in Basin I, Coteau paid WCDC for the past unpaid royalties on the coal wrongly deemed delivered to AVS.[7] The District Court assigned the case to a Magistrate Judge who then realigned the parties, positioning WCDC as the plaintiff, granted summary judgment in favor of WCDC on its claim that Coteau had

_____

[7]Under the parties' agreements, Coteau has the ultimate responsibility for paying the overriding royalty to WCDC, but Coteau is able to pass the cost of the royalty through to each end-use purchaser.

an implied duty to reasonably develop the royalty-bearing reserves, and tried the remaining issues.[8] The Magistrate Judge found that Coteau had breached its duty to develop WCDC royalty-bearing reserves by preferentially mining the Dakota Star reserves and found that WCDC was entitled to interest-only damages on a certain portion of the displaced coal.[9] The Magistrate Judge also held that WCDC's tortious-interference claim failed because WCDC did not prove that Basin and Dakota Coal acted with actual malice when they directed Coteau to implement the deeming accounting method.

WCDC appeals from the judgment, arguing that the Magistrate Judge erroneously interpreted the "prudent-operator standard" applicable to WCDC's claim for breach of implied duty to develop, erred in awarding interest-only damages,

---

[8]The parties consented to try the case before a magistrate judge pursuant to 28 U.S.C. §636(c). The Magistrate Judge described the four trial issues as

> (1) whether Basin and Dakota Coal acted with the requisite intent in inducing Coteau to breach its contract with WCDC by implementing the deeming method, and whether their acts were justified; (2) whether Coteau breached its implied duty of reasonable development by preferentially mining the Dakota Star reserves; (3) whether Basin and Dakota Coal intentionally interfered with WCDC's contract by directing Coteau to preferentially mine the Dakota Star reserves; and (4) whether Basin and Dakota Coal are liable for punitive damages.

ANR W. Coal Dev. Co. v. Basin Elec. Power Coop., Civil No. A1-92-105, Memorandum and Order for Judgment at 11 (D.N.D. Aug. 12, 1999). WCDC does not appeal the Magistrate Judge's adverse judgment on WCDC's claim that Basin and Dakota Coal intentionally interfered with WCDC's contract by ordering Coteau to preferentially mine the Dakota Star reserves.

[9]Rather than award the full value of the royalties on the portion of the coal she determined had been displaced, the Magistrate Judge awarded only the interest that would have accrued on the full payment of the displaced royalties.

misinterpreted North Dakota law in concluding that Dakota Coal and Basin did not tortiously interfere with WCDC's contract with Coteau, and calculated WCDC's damages using the deeming method rejected in Basin I. WCDC further argues that the Magistrate Judge's damage calculations employ the wrong interest and discount rates, that the court should have awarded delay-rental-payback damages, and that the court abused its discretion in denying WCDC's Federal Rule of Civil Procedure 59(e) motion.

Basin, Dakota Coal, and Coteau cross-appeal, urging three grounds for reversal. They argue that the court erroneously found that Coteau owed WCDC an implied duty to reasonably develop WCDC's royalty-bearing reserves; that, if a duty to develop applied, the court erred in finding that Coteau breached that duty; and finally that even if there were a duty and a breach, it was error to award WCDC damages for that breach.

II.

Coteau, Basin, and Dakota Coal together filed a notice of cross-appeal from the Magistrate Judge's judgment. In their brief the cross-appellants only address alleged errors related to the Magistrate Judge's judgment against Coteau on WCDC's claim that Coteau breached an implied covenant of reasonable development and mining. Because Coteau was the only entity found to owe a duty to WCDC, we will treat Coteau as the cross-appellant. We address the cross-appeal first.

A.

WCDC's complaint alleged that Coteau breached an implied covenant of reasonable development and mining by preferentially mining the Dakota Star reserves. The Magistrate Judge, in a pretrial summary judgment ruling, held that Coteau owes to WCDC an implied duty to reasonably develop the coal reserves that

-9-

were subject to WCDC's overriding royalty.[10] In its cross-appeal, Coteau argues that, although with respect to oil and gas leases North Dakota law implies a duty to reasonably develop, North Dakota courts have not and would not impose such a duty in favor of an overriding-royalty owner whose interest is created in a mineral lease. Coteau claims that the rationales usually invoked for implying such a duty simply do not apply to the contractual relationship between Coteau and WCDC. We have not found any North Dakota case addressing this precise issue; therefore, "our duty is to predict how the North Dakota Supreme Court would resolve" this claim. Basin I, 105 F.3d at 422.

The Magistrate Judge held that the implied duty exists between WCDC and Coteau, basing its finding in part on the North Dakota Supreme Court's recognition of the implied duty in oil and gas leases, see Feland v. Placid Oil Co., 171 N.W.2d 829, 835 (N.D. 1969), and its conclusion that "the legal theories involved with leaseholds and royalties are basically the same whether they are for extraction of gold, iron, or some other mineral," Finstrom v. First State Bank of Buxton, 525 N.W.2d 675, 677 n.1 (N.D. 1994).

Having reviewed this question of state law de novo, we agree with the Magistrate Judge (for slightly different reasons) that on the facts of this case the Supreme Court of North Dakota likely would imply the duty of reasonable development in Coteau's contract with WCDC.

First, the parties do not dispute that North Dakota implies the duty of reasonable development in oil and gas leases. See, e.g., Olson v. Schwartz, 345 N.W.2d 33, 38 (N.D. 1984) ("It is well settled that the lessee of an oil and gas lease has an implied obligation to the lessor to do everything that a reasonably prudent

---

[10]We review this question of North Dakota law de novo. Salve Regina Coll. v. Russell, 499 U.S. 225, 239 (1991).

operator would do in operating, developing, and protecting the property . . . ."); Feland, 171 N.W.2d at 835; Hermon Hanson Oil Syndicate v. Bentz, 40 N.W.2d 304, 308 (N.D. 1949). Second, that this case is about coal reserves, rather than oil and gas leases, does not appear to limit the implied duty under North Dakota law. The North Dakota Supreme Court has suggested that cases concerning oil and gas leases and royalties should, and do, apply to coal and other minerals. In Finstrom, the court cited with approval a case from our own court, Superior Oil Co. v. Devon Corp., 604 F.2d 1063, 1068-69 (8th Cir. 1979), in which we "applied, to an oil and gas lease, the doctrine of an implied covenant to reasonably develop, even though that doctrine had originated in Nebraska in a gravel lease case." Finstrom, 525 N.W.2d at 677 n.1. The court in Finstrom equated the gravel royalties at issue with petroleum royalties, applying prior case law defining unaccrued oil and gas royalties as real property[11] and concluding that the gravel royalty at issue in Finstrom was, before accrual (that is, severance of the gravel), an interest in real property as well. Id. at 677. Thus, the trend in North Dakota law strongly suggests that to protect royalty owners, an implied duty to develop would be found in mineral cases as well as in oil and gas cases.

Coteau, seeking to distinguish lease cases from non-lease overriding-royalty cases like this one, argues that lessors usually seek to develop their mineral rights and that the overriding royalty at issue here is unrelated to any development of mineral rights under a lease. Therefore, Coteau argues, because WCDC is not the lessor or owner of the coal fields at issue, the policy reasons recognized in North Dakota for implying a covenant of development do not support the result WCDC seeks.

---

[11]Unaccrued royalties are royalties that will be earned on minerals that have not yet been severed from the ground; thus, under North Dakota law, they are considered real property. Accrued royalties are royalties due on minerals that have been severed. At the point the mineral is severed from the ground, the right to the royalty becomes a personal property interest under North Dakota law. GeoStar Corp. v. Parkway Petroleum, Inc., 495 N.W.2d 61, 67 (N.D. 1993). The royalty-bearing coal at issue here has not yet been severed.

We disagree. The North Dakota Supreme Court has recognized that, as a policy rationale for implying in oil and gas leases a duty to develop, lessors have a property interest in the oil and gas and a right to receive compensation that should be protected. See Olson, 345 N.W.2d at 39. Under North Dakota law, royalty holders appear to have the same type of interest as lessors. In GeoStar Corp. v. Parkway Petroleum, Inc., 495 N.W.2d 61, 67 (N.D. 1993), the court considered the nature of a royalty interest in the context of a dispute over whether GeoStar was entitled to specific performance of a contract for the conveyance of an overriding-royalty interest in oil and gas wells. The court explained, in no uncertain terms, that under North Dakota law "a royalty interest is real property." Id. at 67. As a result, GeoStar was entitled to specific performance under a North Dakota remedies statute. The Magistrate Judge reasoned, and we agree, that the rationale for implying the duty in regard to lessors holds equally true in regard to overriding-royalty holders. Overriding-royalty holders have an interest that is a form of real property under North Dakota law and, without the implied duty, have "no mineral rights to fall back on" if the coal reserves are not developed. ANR W. Coal Dev. Co. v. Basin Elec. Power Coop., Civil No. A1-92-105, Memorandum and Order at 19 (D.N.D. Oct. 23, 1998). Thus, implying the duty to develop in favor of overriding-royalty holders protects the same interests deemed worthy of protection in regard to lessors in Olson.

Moreover, other jurisdictions have implied the duty of reasonable development in favor of royalty holders. See Garman v. Conoco, Inc., 886 P.2d 652, 659 & n.23 (Colo. 1994) (en banc) (discussing implied duty to market, a corollary under Colorado law to the implied duty to develop), cited in Rogers v. Westerman Farm Co., 29 P.3d 887, 902 n.16 (Colo. 2001) (en banc); United States Steel Corp. v. Whitley, 636 S.W.2d 465, 473 (Tex. Ct. App. 1982) (recognizing implied duty in favor of overriding-royalty owner to produce uranium with due diligence); Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 858 P.2d 66, 82 (N.M. 1993) ("There are occasions . . . when courts will imply covenants to protect the interests of an owner of an overriding royalty . . . ."), cert. denied, 510 U.S. 1116 (1994); 2 Howard R.

Williams & Charles J. Meyers, <u>Oil and Gas Law</u> § 420.1 (rev. 2000). <u>But cf.</u> <u>XAE</u> <u>Corp. v. SMR Prop. Mgmt. Co.</u>, 968 P.2d 1201, 1207 (Okla. 1998) (refusing to allow overriding-royalty holder to enforce implied duty to market).

Therefore, in light of the North Dakota Supreme Court's holdings in <u>Finstrom</u> and <u>GeoStar</u>, as well as recent cases from other jurisdictions recognizing the implied duty to develop in favor of the overriding-royalty owner, we believe the North Dakota Supreme Court, were the issue presented to it, would imply a duty of reasonable development in favor of WCDC. We affirm the Magistrate Judge's grant of summary judgment to WCDC on this aspect of its claim.

B.

Coteau further argues that the Magistrate Judge erred in finding that Coteau breached the implied duty of reasonable development by preferentially mining the Dakota Star reserves. The Magistrate Judge tried this issue and found that Coteau had committed a breach. We review the Magistrate Judge's factual findings for clear error. <u>See</u> <u>Slaaten v. Amerada Hess Corp.</u>, 459 N.W.2d 765, 769 (N.D. 1990) (explaining that under North Dakota law breach is a finding of fact reviewed for clear error).

To determine whether a breach occurred, the Magistrate Judge applied the "prudent-operator" standard outlined in <u>Olson</u>, 345 N.W.2d at 39. In <u>Olson</u>, the North Dakota Supreme Court explained that "[i]t is impossible to state a formula by which a court can determine whether a particular lessee has developed a particular lease in conformity with the prudent operator standard. Each case must be decided

on the facts peculiar to it and the burden of proving a breach of the implied covenant is on the party asserting it." Id.[12]

The Magistrate Judge concluded that when WCDC entered the 1987 Coal Reserve Agreement, its expectation was that Coteau would continue to mine royalty-bearing reserves to supply the Gas Plant and AVS for as long as those facilities remained in operation. Moreover, the court found that cost savings and quality concerns did not indicate a need to add other reserves to the Freedom Mine. Coteau's own mine plan showed that by adding the Dakota Star reserves there would be a significant reduction in production from WCDC's reserves through 2009 (the year the Gas Plant's long-term supply contracts expire). ANR W. Coal Dev. Co. v. Basin Elec. Power Coop., Civil No. A1-92-105, Memorandum and Order for Judgment at 28-29 (D.N.D. Aug. 12, 1999). Basin had requested Coteau to produce as much coal as possible from Dakota Star. When Coteau's plan to preferentially mine Dakota Star resulted in "substantial tons of Dakota Star coal being delivered to the Gas Plant and AVS, thus significantly delaying development of WCDC's reserves," Coteau failed to act as a prudent operator and thus breached its duty to WCDC, failing entirely to

---

[12]In Olson, the court outlined factors relevant to applying the prudent-operator standard in the context of an oil and gas lease, relying on a decision of the Kansas Supreme Court. Olson, 345 N.W.2d at 39-40. Of the non-exclusive factors outlined in Olson, those relevant to mineral leases include (1) the quantity of mineral capable of being produced as indicated by prior exploration and development; (2) the local market and demand for that mineral; (3) the extent and results of operations, if any, on adjacent lands; (4) the usages of the business; (5) the cost of the mining operations; (6) the cost of transportation and storage, and the prevailing price of the mineral; (7) general market conditions as influenced by supply and demand or by government regulation of production; (8) evidence of the willingness of another operator to mine the tract in question; (9) the attitude of the lessee toward further development; and (10) the time elapsed since mining operations were last conducted. See id.; see also Johnson v. Hamill, 392 N.W.2d 55, 57-58 (N.D. 1986). Not all of the factors identified in Olson are relevant to this case.

consider "WCDC's interests or expectation that its coal would be used for the Gas Plant and AVS." Id. at 28.

Coteau's arguments fail to convince us that the Magistrate Judge committed clear error. The Magistrate Judge found several facts relevant to the prudent-operator inquiry as outlined in Olson. 345 N.W.2d at 39-40. For example, the court recognized that the potential closure of the Gas Plant in 2009 significantly limits the market for Freedom Mine coal. The court also found that Coteau's mine plan before adding the Dakota Star reserves, designated as Engineering Report (ER) 802, has the same quality parameters as ER 803, which included the Dakota Star Reserves. In other words, the royalty-bearing coal met the quality parameters of both plans. Coteau's projected cost savings from adding Dakota Star were only twelve cents per ton (only a 1.7% reduction in cost, according to Coteau's expert), a savings deemed negligible by the Magistrate Judge in relation to the losses incurred by WCDC from Coteau's preferential mining of Dakota Star.

The Magistrate Judge also made findings regarding the parties' motivations and expectations. The court found that Basin wanted to produce as much coal from Dakota Star as possible because Coteau's payments to Basin for the purchase of the reserves were based in part on the tons of coal mined and delivered from them. Moreover, the court's assessment of WCDC's expectations indicated that after the 1987 Coal Purchase Agreement, WCDC expected that Coteau would mine the Freedom Mine royalty-bearing reserves for as long as the Gas Plant and AVS remained in production. The agreement placed upon Coteau the risk that Basin and Dakota could essentially force Coteau into a breach with WCDC by exercising Dakota's right to disapprove of Coteau's mine plans and direct Coteau to adopt revisions thereto, such as adding the Dakota Star Reserves.

Coteau's challenge to the Magistrate Judge's findings would have this Court focus on two sets of facts: the amount of royalties already collected by WCDC and

Coteau's "development and adherence to mining plans" at the Freedom Mine. Although Coteau insists that WCDC has done extremely well financially with respect to its initial investment in the Freedom Mine, the agreements of the parties set no upper limit on the amount of the overriding-royalty payments WCDC might earn for that investment. Moreover, Coteau has not cited any North Dakota cases, and we have found none, that would suggest we should so exclusively focus on the amount WCDC has earned in this transaction. The Magistrate Judge made a finding regarding the nature of WCDC's "reasonable expectations"—that mining of the Freedom Mine would continue as long as the Gas Plant and AVS continued to operate—and Coteau has not pointed us to any evidence in the record demonstrating that this finding is clearly erroneous. In fact, the finding reflects a determination that can reasonably be reached rather easily by reading the agreements in question.

Coteau's argument based on its "development and adherence to mining plans" at the Freedom Mine suffers similar defects. Coteau may be technically correct in asserting that "[n]o mine plan investigated is economically nor qualitatively superior to plans actually implemented by Coteau which incorporated mining of the Dakota Star reserve beginning in 1993," Appellee's Br. at 39, but only in the sense that ER 802 cost just slightly more than and contained quality parameters equal to those found in its later mine plans that included Dakota Star. In any case, as the Magistrate Judge determined, this assertion misses the mark in regard to the prudent-operator standard. Under that standard, Coteau is obligated to consider both its own interests and those of WCDC as the overriding-royalty holder. Olson, 345 N.W.2d at 38. We see no clear error in the court's findings regarding Coteau's mine plans, the economics of adding the Dakota Star reserves, and Coteau's failure to consider WCDC's interests in implementing its mine plans calling for the preferential development of the Dakota Star reserves.

Because Coteau has not shown any clear error in the Magistrate Judge's findings, WCDC has, as a matter of law, sustained its burden of proof regarding

Coteau's breach of the implied duty of reasonable development. We affirm the Magistrate Judge's judgment for WCDC on this claim.

## III.

We turn now to the issues raised by WCDC's appeal. WCDC asserts error in the Magistrate Judge's calculation of damages, in her refusal to award delay-rental-payback damages, and in her rejection of WCDC's tortious-interference claim. We first address the question of damages.

## A.

WCDC appeals from the Magistrate Judge's award of damages on its claim for breach of duty to develop. As an initial matter, WCDC urges us to find error in the Magistrate Judge's conclusion that some portion of the Dakota Star reserves could reasonably have been mined by Coteau to supply LOS and UPA. We see no clear error in the Magistrate Judge's conclusion that it was not a breach of the implied duty to reasonably develop merely to add Dakota Star to the reserves mined by Coteau, because the 1987 Coal Reserve Agreement clearly contemplates Dakota's authority to add to and subtract from the reserves being mined by Coteau. See 1987 Coal Reserve Agreement ¶ 9(a). Thus, the Magistrate Judge's holding that some portion of Dakota Star could be mined to supply LOS and UPA stands. Although this conclusion is helpful to Coteau, it is not entirely dispositive of the damages issue.

WCDC argues that even if Coteau could reasonably mine some portion of Dakota Star, the Magistrate Judge nevertheless erred in figuring damages. In calculating the tons of coal per year on which WCDC reasonably expected to receive a royalty (the coal that was unreasonably displaced by the preferential mining of Dakota Star), the Magistrate Judge concluded that WCDC could only reasonably expect to receive royalties on the coal supplied to the Gas Plant and AVS (about 11.5

-17-

million tons per year). Thus, she completely excluded coal supplied to LOS and UPA from the calculation of WCDC's damages. Coal from Renners Cove, another non-royalty-bearing field mined by Coteau, was also deemed to supply only the Gas Plant and AVS, thus further reducing the amount of royalty coal the Magistrate Judge found to have been wrongfully displaced.

WCDC contends that the Magistrate Judge's calculation employs the very same deeming accounting method that we rejected in Basin I. We said in Basin I that the parties could not deem certain coal as delivered to certain markets, and we directed application of the pro-rata method to determine the amount of coal that had been delivered to each location. 105 F.3d at 424. The pro-rata method is the law of the case and must be applied to the damages calculations here. See United States v. Bartsh, 69 F.3d 864, 866 (8th Cir. 1995). WCDC correctly concludes that under our decision in Basin I, "production from Mine Areas 1-4, Renners Cove, and Dakota Star must be proportionally allocated to all markets" for the purpose of determining the quantum of coal displaced by Coteau's preferential mining of Dakota Star. Appellant's Br. at 35. Thus, the Magistrate Judge must make a pro-rata allocation of royalty-bearing coal delivered to each customer (LOS, UPA, AVS, and the Gas Plant) before calculating WCDC's damages.[13]

B.

WCDC argues it is entitled to more damages than simply the interest it would have earned on the royalties of which it has been deprived by Coteau's preferential mining of Dakota Star. The Magistrate Judge concluded that "WCDC has not

_____

[13]Based upon our conclusion, WCDC's post-trial motion to alter or amend the judgment under Federal Rule of Procedure 59(e) was well-founded, and it was an abuse of discretion for the Magistrate Judge to deny that motion. See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir. 1998) (standard of review).

actually lost any royalties, just the time value of the underpaid royalty amount, and thus WCDC is not entitled to recover the actual royalty underpayment as damages," but only the interest income. ANR W. Coal Dev. Co., Memorandum and Order for Judgment at 33 (Aug. 12, 1999). Coteau urges us to accept the Magistrate Judge's damage calculation, arguing that even though other courts have rejected this interest-only rule, it is appropriate here because the "case is unique in not only its complexity, but the manner in which the alleged damages to WCDC arose." Appellee's Br. at 55. Coteau maintains that to apply any other rule would result in overcompensating WCDC, because the coal in the ground is still available to mine and to generate royalties for WCDC.

As WCDC notes, North Dakota has not addressed the measure of damages for breach of the implied covenant of development on facts similar to this case. Some courts that have considered the issue agree, with certain caveats, that the measure of damages for such a breach should be the royalty that would have been received had the mining been diligently pursued. See 76 A.L.R.2d 721, 748 §6. Courts refer to this measure of damages as the "royalty rule."

The Texas Supreme Court is among those courts that have adopted the royalty rule, explaining,

> [T]he award of interest only does not give the lessor what he would have received had the lessee performed his obligation.
>
> The purpose of the law to give compensation for breach of contract is subserved by allowing the injured party to have the value to him of the contract's performance. . . . Therefore, to allow the lessor the value of royalty wrongfully withheld from him complies with the law's fundamental purpose of adequate compensation. The lessor is put in the same position as though the contract had been performed.

-19-

<u>Tex. Pac. Coal & Oil Co. v. Barker</u>, 6 S.W.2d 1031, 1037 (Tex. 1928). California courts adopted the same rule in <u>Gold Mining & Water Co. v. Swinerton</u>, 142 P.2d 22, 34 (Cal. 1943), stating,

> True, plaintiff still has the mining property and may lease it again on a royalty basis, but even if it does so and receives a royalty on all of the gold extracted from the 300,000 cubic yards of gravel which defendants agreed to extract, plaintiff will not thereby recover double damages or receive *as royalty* the amount it is entitled to recover from defendants as damages. In other words, what plaintiff is entitled to recover from defendants under the rule here announced *is damages for the failure of defendants to perform their agreement under the lease to mine the property, extract the mineral therefrom and pay plaintiff a royalty thereon.* Since defendants have failed to perform, plaintiff may recover from them as damages an amount equal the amount of royalty which plaintiff would have received had defendants operated the property in accordance with the provisions of the lease.

<u>See also</u> <u>Fisher v. Hampton</u>, 118 Cal. Rptr. 811, 814 (Ct. App. 1975) (reaffirming California's adherence to the royalty rule); <u>see also, e.g.</u>, <u>Cotiga Dev. Co. v. United Fuel Gas Co.</u>, 128 S.E.2d 626, 638-39 (W. Va. 1962) (applying royalty rule, but concluding that defendant would be entitled to offset the present payment of royalty damages against royalties due when the wrongly delayed production of minerals is finally completed); <u>Cawood v. Hall Land & Mining Co.</u>, 168 S.W.2d 366, 369-70 (Ky. 1943) (approving royalty rule and awarding interest for period of unreasonable delay in development on the lost royalties). <u>But see</u> 3 American Law of Mining § 82.04(2), at 82-22 ("Development clauses are presumptively covenants and not conditions. For nonperformance by the grantee, the grantor will <u>normally</u> be limited to damages equal to interest on the royalties or other payments he would have received if production had been obtained in a timely manner." (footnote omitted and emphasis added)).

Coteau argues that North Dakota would not apply the royalty rule, particularly on these facts, owing to the likelihood of overcompensating WCDC. We think that Coteau's "double-recovery" argument is not well-founded. It is true, as Coteau argues, that WCDC took on some risk that not all the royalty-bearing reserves would eventually be mined. Coteau points to this as a reason to reject WCDC's contention that it is highly likely that after the Gas Plant's supply contracts expire in 2009, its royalty-bearing reserves will cease to be mined. WCDC may have assumed some risk, but it certainly did not assume the risk that came to pass in this case—that Coteau would wrongly refuse to mine an appropriate amount of royalty-bearing reserves. The only way WCDC can be made whole in this instance is to award the full value of the displaced royalties. We reverse and remand for recalculation of damages based on the full royalties owed on the displaced coal. Because we remand for an award of full royalties, we see no need to address WCDC's interest-rate and discount-rate arguments.

IV.

WCDC advanced over $11 million to NACCO for delay rentals, which were paid to maintain the coal leases needed by WCDC for development of the Gas Plant and to hold those leases from 1972 until construction of the plant and AVS was finished. WCDC was owed a delay-rental payback on all coal mined, sold, and delivered, up to an aggregate amount of approximately 233 million tons, from the Freedom Mine leases held by Coteau at the time of the 1987 agreement. The delayed development of these reserves resulting from the preferential mining of Dakota Star has in turn wrongly reduced the delay-rental payback received by WCDC.

The Magistrate Judge reasoned that because she rejected WCDC's proffered expert testimony that removed all Dakota Star production from the calculation of WCDC's damages, WCDC failed to carry its burden of proof on this issue. Under North Dakota law, however,

-21-

> When the fact of injury has been proved with reasonable certainty, the fact that the amount of damages may be hard to prove does not prevent the jury from awarding damages.
>
> . . . .
>
> Uncertainty as to the amount of damages does not preclude recovery, and mathematical certainty as to the amount of recovery is not necessary. If a reasonable basis for computing an approximate amount of damages is provided, that is all that the law requires.

N. Am. Pump Corp. v. Clay Equip. Corp., 199 N.W.2d 888, 895-96 (N.D. 1972), quoted in Symington v. Mayo, 590 N.W.2d 450, 454 (N.D. 1999). WCDC has offered sufficient proof that the delayed development was wrongful, and because the delay-rental-payback payments are tied to the rate of coal development, WCDC has sustained damages. Moreover, the pro-rata method, applied to the tonnage of WCDC royalty-bearing coal wrongfully displaced by Coteau's preferential mining of Dakota Star, provides a reasonable basis for computing WCDC's delay-rental-payback damages. The Magistrate Judge clearly erred, therefore, in concluding that WCDC failed to carry its burden of proof on this element of damages. Because we reverse and remand on the damages calculation for breach of implied duty to reasonably develop, based on the Magistrate Judge's erroneous deeming of all Dakota Star reserves to LOS and UPA, we must also reverse the Magistrate Judge's rejection of delay-rental-payback damages and remand for further proceedings.

V.

Finally, we consider WCDC's appeal from the Magistrate Judge's adverse judgment on WCDC's claim of tortious interference with contract. WCDC alleges that Basin and Dakota Coal tortiously interfered with WCDC's contract with Coteau by directing Coteau to implement the deeming accounting method. The Magistrate Judge found that WCDC's evidence failed to establish all the elements of tortious

interference required by North Dakota law. Specifically, the court found that the "evidence indicates that defendants' motive and purpose behind the deeming method was to get the full benefit of the $40 million 'prepurchase,' to which they in good faith believed they were entitled." ANR W. Coal Dev. Co., Memorandum and Order for Judgment at 15 (Aug. 12, 1999). Thus, the Magistrate Judge held that WCDC failed to establish the intent element of its claim. WCDC argues that this justification is a pretext that the court must reject because the 1982 Purchase Agreement states in plain language that the royalty prepayment solely applies to coal actually delivered to AVS. See 1982 Purchase Agreement ¶ 2.

Under North Dakota law, the tort of interference with contract requires a showing of five elements. Plaintiff must prove the existence of a contract, a breach of that contract, that the defendant instigated the breach, that the defendant instigated the breach without justification, and that the defendant acted intentionally. Peterson v. Zerr, 477 N.W.2d 230, 234 (N.D. 1991); Bismarck Realty Co. v. Folden, 354 N.W.2d 636, 642 (N.D. 1984). The intent required "goes beyond the traditional tort concept of intent"; WCDC must show that the defendants "specifically intended to interfere" with WCDC's contractual rights, or that the defendants "acted with knowledge that the interference would result." Peterson, 477 N.W.2d at 234. In Peterson, the court further explains that the intent requirement

> "applies also to intentional interference . . . in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action."

Id. (quoting Restatement (Second) of Torts § 766 cmt. j. (1979)).[14]  The Magistrate Judge found that WCDC had unquestionably carried its burden of proof on the first three elements.  The Magistrate Judge's opinion analyzes justification and intent together, discussing the facts as presenting a justification that negates any ill intent on the part of Basin or Dakota Coal.

The Magistrate Judge found that Basin and Dakota Coal  prompted Coteau to impose the deeming method.  The court accepted as true Dakota Coal's contentions that using the pro-rata method would result in significantly larger royalty payments to WCDC and would also result in significantly fewer tons of coal being written off under Basin's 1982 prepayment of the overriding royalty for certain tons of coal delivered to AVS.  Moreover, the court found that the studies on which these contentions were based, completed by Dakota Coal in November 1991, "show that defendants were aware that using the deeming method would significantly reduce the royalty paid to WCDC for coal delivered to the Gas Plant, LOS and UPA."  ANR W. Coal Dev. Co., Memorandum and Order for Judgment at 16 (Aug. 12, 1999).  The court concluded from these facts that the inference to be drawn was that defendants were not motivated by a desire to "'cheat' WCDC out of the royalty it was due."  Id.

Despite the Magistrate Judge's conclusion to the contrary, we conclude that under North Dakota law, Basin and Dakota Coal's motive and purpose are not material in this instance.  In Peterson, the North Dakota Supreme Court adopted comment j to section 766 of the Restatement.  Under that comment, even if an actor has a legitimate motive or purpose for its actions, if the actor has knowledge of the

---

[14]Basin and Dakota Coal cite language from Blair v. Boulger, 336 N.W.2d 337 (N.D.), cert. denied, 464 U.S. 995 (1983), and Hennum v. City of Medina, 402 N.W.2d 327 (N.D. 1987), in support of the Magistrate Judge's interpretation of North Dakota law on tortious interference.  We rely on Peterson instead because it is the most recent statement of the North Dakota Supreme Court regarding the elements of this claim.

consequences of its acts, then it may be liable for tortious interference with contract. The Magistrate Judge found that Basin and Dakota Coal had the requisite knowledge of the inevitable effect of the deeming accounting method—that it would undercut WCDC's position in relation to its royalty agreement with Coteau regarding the royalty-bearing reserves. That finding is enough, under North Dakota law, to establish tortious interference as a matter of law. Therefore, we hold that the Magistrate Judge erred as a matter of law in rejecting WCDC's tortious-interference-with-contract claim on the basis of its finding that Basin and Dakota Coal did not act with the purpose and intent of interfering with WCDC's contractual right to royalty payments when they directed Coteau to implement the deeming accounting method. We reverse the judgment for Basin and Dakota Coal, and remand for further proceedings. On remand, WCDC should have the opportunity to prove its damages recoverable on this claim.[15]

## VI.

For the reasons stated, the portion of the judgment appealed by Basin, Dakota Coal, and Coteau is affirmed, and the portion of the judgment appealed by WCDC is reversed. The case is remanded for further proceedings consistent with this opinion.

WCDC's motion to file its tendered supplemental brief is denied.

---

[15]Issues concerning the damages recoverable on the tortious-interference claim have not been raised in this appeal and must be addressed initially on remand. We note the possibility that redundancy, in whole or in part, may exist between WCDC's tortious-interference damages and its preferential-development damages.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.